## UNITED STATES DISTRICT COURT
## DISTRICT OF NEVADA

ANTHONY MITCHELL,

        *Plaintiff,*

    v.

RYAN COHEN, an individual;
ROBINHOOD FINANCIAL LLC, a
Delaware Limited Liability Company;
ROBINHOOD SECURITIES, LLC, a
Delaware Limited Liability Company;
ROBINHOOD MONEY, LLC, a Delaware
Limited Liability Company; THE
DEPOSITORY TRUST & CLEARING
CORPORATION, a New York Corporation;
20230930-DK-BUTTERFLY-1, INC., a New
York Corporation doing business as BED
BATH & BEYOND; OVERSTOCK.COM,
INC., a Delaware Corporation doing business
as  BED BATH & BEYOND; RC
VENTURES LLC, a Delaware Limited
Liability Company; SUE E. GOVE, an
individual,

        *Defendants.*

Case No. 2:24-cv-01042



---

### PLAINTIFF'S OPPOSITION TO DEFENDANT SUE GOVE'S
### MOTION TO DISMISS THE COMPLAINT

COMES NOW Plaintiff Anthony Mitchel (hereafter referred to as "Plaintiff"), to submit

his Opposition to Defendant Sue Gove ("Overstock" or "Defendant")'s Motion to Dismiss

Plaintiff's Complaint ("Motion") and respectfully requests this Honorable Court to deny

Defendant's Motion. In support, Plaintiff submits the accompany Memorandum of Points and Authorities.

Dated: November 12, 2024                              Respectfully submitted,

                                                     ANTHONY MITCHELL, Pro se

## TABLE OF CONTENTS

I.     PRELIMINARY STATEMENT ..................................................................................1

II.    FACTUAL BACKGROUND ....................................................................................1

III.   STANDART OF REVIEW ......................................................................................10

IV.    ARGUMENT ........................................................................................................10

A.     Plaintiff sufficiently pleads claims against Gove ...............................................10

V.     ALTERNATIVELY REQUEST TO ALLOW PLAINTIFFS TO AMEND THE COMPLAINT ....................14

VI.    CONCLUSION ......................................................................................................15

# **TABLE OF AUTHORITIES**

**Cases**

*Davis v. Liberty Mut. Ins. Co.*, 871 F.2d 1134, 1136 (D.C. Cir. 1989).........................................15

*Firestone v. Firestone*, 76 F.3d 1205, 1208 (D.C. Cir. 1996).......................................................15

*Foman v. Davis*, 371 U.S. 178, 182 (1962) .................................................................................15

*Glazer Capital Mgmt., L.P. v. Forescout Techs., Inc*, 2023 U.S. App. LEXIS 6285 ..................14

*In re Vitamins Antitrust Litigation*, 217 F.R.D. 30, 32 (D.D.C. 2003) .........................................15

*Ind. Pub. Ret. Sys. v. Pluralsight, Inc.*, 45 F.4th 1236, 1267 (10th Cir. 2022) ...........................14

*Morley v. Walker*, 175 F.3d 756, 759 (9th Cir.1999)...................................................................11

*Polich v. Burlington N., Inc.*, 942 F.2d 1467, 1472 (9th Cir.1991) ..............................................11

*Richardson v. United States*, 193 F.3d 545, 548-49 (D.C. Cir. 1999) ..........................................15

SEC v. Rio Tinto PLC, No. 17-cv-7994 (AT), 2019 U.S. Dist. LEXIS 43986 ...........................15

*Swartz v. KPMG LLP*, 476 F.3d 756, 763 (9th Cir.2007) ............................................................11

**PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES
IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS**

## I.    PRELIMINARY STATEMENT

It is well-settled that the court considers the complaint itself, documents attached to the complaint, documents that are critical to the complaint and referred to in it, and information that is subject to proper judicial notice, as well as additional facts set forth in [plaintiff's] . . . brief . . . , so long as those facts are consistent with the pleadings. In this case Plaintiff's complaint and attached documents sufficiently pleads claims against Sue Gove.

Plaintiff needs not prove his case at the pleading stage. Instead, it is enough that the complaint places the Defendant on notice of what activity is being accused of violation. In the present case Plaintiff satisfied the pleading standard by giving Defendant fair notice of improper conduct.

Plaintiff further objects to Defendant's Motion to Dismiss because Defendant specifically references each and every element of a claim when at this state of the litigation Plaintiff is not required to specifically outline each and every element of a claim. See *Swierkiewicz v. Sorema, N.A.*, 534 U.S. 506, 511-12 (2002).

In the event the allegations in Plaintiff's Complaint are inadequate in any respect, Plaintiff respectfully requests an opportunity to amend his Complaint.

## II.    FACTUAL BACKGROUND

Between July 2022 and April 2023 Plaintiff purchased 8847 shares of Bed Bath stock ("BBBY shares") from Robinhood. On October 20, 2023, Plaintiff noticed that his 8847 shares were no longer in Robinhood's account and contacted Robinhood's support. Robinhood provided

1

Plaintiff with a full accounting of his BBBY purchase history and informed him that his shares "hold no value" and that the instructions to remove the BBBY shares from the Robinhood platform were given to Robinhood investor relations from Depository Trust a few days prior. Complaint at ¶¶17-19.

Bed Bath and Beyond, hereinafter referred to as Bed Bath is a home goods retailer with a chain of big-box stores and similarly named domain that sells products for the home such as bed linens, bath accessories, kitchen textiles, dinnerware and electric appliances. It also owns and operates a specialty retailer called buybuy BABY Inc. ("buybuy BABY"), which sells products meant for infants and children. Over the last few years, Bed Bath has experienced a dramatic decline in sales and earnings, persistent losses, and a significant loss of market share to behemoths such as Amazon.com Inc. ("Amazon"), Walmart Inc. ("Walmart") and Target Corporation ("Target"). Bed Bath has effectively lost relevance with customers, and its poor financial performance has been accompanied by a lethal combination of sky-high debt and an endangered cash balance that has now left it days away from filing for bankruptcy. Complaint at ¶22.

However, the severity of these problems was known to the Defendants with a high degree of specificity before the market was able to fully understand their implications, and billionaire Cohen used his access to Bed Bath executives and his information advantage to exit his large position in the Bed Bath at a substantial profit. Along the way, Cohen manipulated the market for Bed Bath securities to create liquidity and secretly sold the entirety of his interests in Bed Bath while abandoning ordinary investors, who looked to him for guidance. Complaint at ¶23.

Cohen became one of the principal leaders of the "meme stock" movement. Meme stocks are stocks that gained viral popularity on discussion threads on Reddit and/or social media platforms like Twitter, where online communities of retail investors dedicated their attention to particular stocks, sometimes for purposes of initiating a squeeze on short investors and hedge funds, and other times based on genuine beliefs about a company's prospects. Cohen publicly embraced these retail investors, affirmatively told them that he was in the best position to look out for their long-term interests and that his turnaround strategies would be far more effective than anything conjured by more experienced executives with management responsibilities because they earned undeserved, risk-free and excessive compensation detached from actual results. By the time Cohen purchased nearly 10% of the Bed Bath's outstanding shares in March 2022, he was one of the key leaders of the meme stock movement. By his own admission, the mere disclosure of his interest in a particular company would encourage retail investors to purchase that stock and lead to an exponential rise in its price. Cohen had also tweeted about his investments to hundreds of thousands of followers and saw evidence of dramatic stock price movements solely due to his words and actions. Complaint at ¶24.

In March 2022, after Cohen threatened to take control of Bed Bath's Board of Directors, Bed Bath quickly entered into a cooperation agreement (hereafter the "Cooperation Agreement") with him that required him to stand down in exchange for influence and access. Key terms of the Cooperation Agreement allowed Cohen to obtain three new seats on the Board, and outsized influence over a new Board Strategy Committee charged with evaluating options for buybuy BABY's future. buybuy BABY was then considered the "crown jewel" of Bed Bath, but the subsidiary's financial performance turned lackluster and its value greatly diminished right before

Cohen formed a secret plan to dump all his holdings. Complaint at ¶25.

Cohen was initially fixated on buybuy BABY, stating that he believed it was worth at least several billion dollars, and that a sale or spinoff of this asset would be the solution to the Bed Bath's longstanding struggles with soaring debt and a deteriorating balance sheet. Unbeknownst to investors, but known to Cohen weeks before the Class Period commenced, the Bed Bath had rejected Cohen's proposal to sell or spinoff buybuy BABY because a serious liquidity crisis threatened its ability to remain a going concern. Investors did not learn all of these facts until after the Class Period ended and Cohen had already cleaned out his account. Complaint at ¶26.

At the time he dumped his holdings, Cohen knew that Bed Bath's liquidity and credit crises had worsened beyond repair and that buybuy BABY's sale or spinoff was off the table. This caused Cohen to sour on Bed Bath's securities and sell his holdings, but he did not disclose these facts as he was required to do by the federal securities laws. Cohen knew that the Board had rejected his proposal to sell or spinoff buybuy BABY weeks before he formed a plan to liquidate his entire position, as demonstrated by the following facts:

- Cohen controlled multiple Board seats and was an active participant in Bed Bath's affairs and communicated with the Board and management about Bed Bath's strategy. For instance, Cohen's communication with the Board precipitated the termination of Bed Bath's previous Chief Executive Officer ("CEO") in June 2022;
- Also in June 2022, Bed Bath hired a consultant to focus on cash and balance sheet optimization, demonstrating that the Board and management were aware that problems with liquidity had worsened. The Strategy Committee, dominated by Cohen's appointees, would not overlook whether a sale of buybuy BABY enhanced or undermined the goals of increasing cash and optimizing the balance sheet;
- On July 14, 2022, the Chairman of the Board of Directors told investors that the Strategy Committee, dominated by Cohen's Board nominees, had already studied the issue and "identified several options" for buybuy BABY. By that time, the value of buybuy BABY had already deteriorated to the point that its sale or spinoff would not resolve Bed Bath's

4

financial problems. Cohen's appointees on the Strategy Committee and his communications with management gave him access to and knowledge of these facts;

- Cohen communicated with Bed Bath's Chief Financial Officer ("CFO") and other senior executives in conference calls;

- On the evening of August 16, 2022, after Cohen had already dumped most of his Bed Bath common stock, The Wall Street Journal (hereafter "The WSJ") reported that Bed Bath was "hunting" for an extension of an existing credit line that would provide hundreds of millions of dollars in relief and would be backed by an equity interest in buybuy BABY. This article was published in the print edition of the paper on the next day, when Cohen liquidated his remaining holdings in Bed Bath;

- On August 31, 2022, within two weeks of Cohen's sales, Bed Bath executed a final version of an amended loan agreement that contained extremely onerous restrictions preventing asset sales in excess of an aggregate amount of $10 million and locking up buybuy BABY as collateral to secure the obligations;

- Bed Bath has admitted that it had worked on this loan agreement for "several weeks," confirming that it was being finalized as Cohen was dumping shares and options on unsuspecting investors. News about the law firm hired by Bed Bath to advise on the loan agreement emerged on the day Cohen revealed that he dumped his entire stake. The loan agreement involved negotiations between an administrative agent, sixteen different lenders, six different law firms, management, Bed Bath's Board (including Cohen's Board nominees) and other counterparties. It is inconceivable that the substance of the contract, including the covenants prohibiting Cohen's desired sale of buybuy BABY, was not known to Cohen at the time he sold his shares and options; and

- Subsequent reporting in the press in September 2022 confirmed that the expanded loan package was contingent on including buybuy BABY as collateral.

- Armed with this information, Cohen formed a plan to sell all his shares and options. But, knowing that this information would destroy retail investor interest in Bed Bath, starting on August 12, 2022, Cohen began to manipulate the market for Bed Bath securities by publicly encouraging retail investors to buy while he planned to sell. With misleading statements, filings, and a false Twitter post with a moon-emoji suggesting he believed Bed Bath's stock price was going "to the moon," he rallied hundreds of thousands of his followers to drive up its price.

- Investors unambiguously understood Cohen's moon-emoji tweet to mean that he expected Bed Bath's stock price to rise dramatically. As a result, trading volume and Bed Bath's stock price surged over the next few days. On August 15, 2022 after-market hours and on August 16, 2022, Cohen encouraged further buying by strategically filing delayed SEC Forms (which were due several months earlier and had nothing to do with any change in circumstances), both reminding investors that he was then a holder of more than 10% of Bed Bath's stock. Cohen subsequently admitted understanding (and on nine previous occasions confirmed to him) that the price of Bed Bath's stock dramatically rises when he files these Forms because of how retail investors perceive his moves. As such, Cohen deliberately filed these Forms when he did in order to stimulate retail activity and increase liquidity to sell his own securities. In one of these filings, Cohen

further failed to disclose that he had already formed a plan to sell Bed Bath securities in violation of the Exchange Act.

- After the market closed on August 16, 2022, Cohen submitted to the SEC a Form 144 regarding his intention to sell shares. While the SEC encourages filing these forms on its EDGAR system, which would immediately provide investors access, he instead submitted it by email, which the SEC publishes the following day or thereafter. Cohen's delay allowed him to surreptitiously liquidate his holdings at artificially high prices and volume, stoked by his encouragement that retail investors buy, not sell, Bed Bath shares. On August 17, 2022, after the market closed, Cohen's Form 144 was publicly released, and identified a "potential" plan to sell but was otherwise untruthful. In the Form 144, Cohen falsely stated that he had not sold any securities when the Form was submitted. However, Lead Plaintiff's review of intraday and aftermarket trade data demonstrates with certainty that Cohen had already sold massive amounts of Bed Bath securities at that time.

- On August 17, 2022, CNBC specifically asked Bed Bath to comment on the information disclosed in Cohen's Form 144 and its implications. Bed Bath did not candidly disclose the truth about Bed Bath's deteriorated relationship with Cohen, instead stating that it was "pleased to have reached a constructive agreement" with Cohen and his LLC, and had "been working expeditiously over the past several weeks with external financial advisors and lenders on strengthening our balance sheet." But the agreement with Cohen was anything but "constructive" at the time, since he had sold all of his holdings, because of the strategic plans that Bed Bath had chosen with the very "financial advisors and lenders" Bed Bath referenced.

- On August 18, 2022, after the market closed, Cohen finally disclosed that he had sold his entire stake in Bed Bath. As a result, Bed Bath's stock price plunged over the next three trading days. It closed at $11.03 on August 19, 2022 from its previous day's closing price of $18.55, on heavy trading volume, dropped further to close at $9.24 on August 22, 2022, and again slid to close at $8.78 on August 23, 2022.

Complaint at ¶27.

On August 17, 2022, CNBC published a story entitled "Bed Bath & Beyond shares fall after investor Ryan Cohen reveals intent to sell entire stake." The centerpiece of the story was a report on Cohen's Form 144, describing its contents, and speculating that "[i]f Cohen hypothetically managed to sell all of his Bed Bath common stock at Wednesday's closing price of $23.08, he'd net about $60 million, according to a CNBC calculation. Cohen's hypothetical profits could [sic] [be] larger if he also sold the options contracts." Lauren Thomas and Jesse Pound, Bed Bath & Beyond shares fall after investor Ryan Cohen reveals intent to sell entire

stake, CNBC, (August 17, 2022, 4:41 PM), https://www.cnbc.com/2022/08/17/bed-bath-beyond-shares-fallmore-than-10percent-after-investor-ryan-cohen-reveals-intent-to-sell-entire-stake.html. CNBC directly reached out to Bed Bath for comment on Cohen's Form 144. In response, an emailed statement attributed to a woman with authority to speak on behalf of Bed Bath said that Bed Bath was "pleased to have reached a constructive agreement with RC Ventures in March and are committed to maximizing value for all shareholders. Specifically, we have been working expeditiously over the past several weeks with external financial advisors on strengthening our balance sheet." Complaint at ¶29.

On August 18, 2022, before the market opened, Bed Bath filed a Current Report on Form 8-K, in which it disclosed that Bed Bath had made the following statements in response to media inquiries on August 17, 2022:

> We were pleased to have reached a constructive agreement with RC Ventures in March and are committed to maximizing value for all shareholders. We are continuing to execute on our priorities to enhance liquidity, make strategic changes and improve operations to win back customers, and drive cost efficiencies; all to restore our company to its heritage as the best destination for the home, for all stakeholders. Specifically, we have been working expeditiously over the past several weeks with external financial advisors and lenders on strengthening our balance sheet, and Bed Bath will provide more information in an update at the end of this month. Complaint at ¶30.

As the Interim CEO of Bed Bath in August 2022, Sue E. Gove ("Gove") had ultimate authority over the statements identified in Paragraphs 27 and 28, and authorized their release and dissemination. In June 2022, just before her appointment as Interim CEO, Bed Bath entered into a settlement agreement for past improper practices acknowledging its CEO's "responsibility to oversee the accuracy, completeness and timeliness" of "material public disclosures made by Bed

Bath to its security holders or the investment community." The settlement agreement, which Bed Bath posts on the corporate governance portion of its website, also requires the CEO and CFO to comply with policies and procedures set by a Disclosure Committee "to ensure that information required to be disclosed by Bed Bath in its filings with the SEC and other material information that Bed Bath discloses to the investment community is reported accurately and timely." Thus, Gove's specific responsibilities required her to oversee the contents of the August 17, 2022 emailed statement to CNBC and the August 18, 2022 Form 8-K. In addition, Gove, as Chairman of the Strategy Committee until July 2022, knew that material, nonpublic information about Bed Bath was shared with Cohen. Complaint at ¶31.

The statements identified in Paragraphs 27 and 28 were materially misleading when made because Bed Bath omitted to disclose that Cohen and RC Ventures had already formed a plan to liquidate all their holdings and, in fact, had already liquidated the vast majority if not all of their holdings before these statements were made. In addition, by speaking about Bed Bath's attempt to "enhance liquidity" and seek additional financing to "strengthen" its balance sheet, Bed Bath put these issues at play but failed to disclose that the 2022 Credit Agreement eliminated the strategic plan vigorously advanced by Cohen, undermining any incentive for him to remain a holder of Bed Bath securities. As a result, Bed Bath's relationship with Cohen was no longer "constructive," and Cohen's decision to exit from his positions undermined Bed Bath's stated goal of "maximizing value for all shareholders." Complaint at ¶32.

Indeed, reactions from retail investors confirm the materially misleading nature of Bed Bath's statements identified in Paragraphs 179 and 180. At 8:01 PM on August 17, 2022, a user posted a thread on r/WallStreetBets entitled "$BBBY AND RYAN COHEN UPDATE!" that

posted a link to an article published by Reuters regarding Bed Bath's statements identified in Paragraphs 27 and 28. The thread received over 1,800 upvotes. A comment on the thread stated: "Very nice. Actual bullish news right after to counter that pathetic misleading headline earlier about RC liquidating. Next two days should be interesting after this dip." Another user named u/ Glass_Cellist_345 interpreted Bed Bath's statements to mean that "they've agreed to leverage buy buy baby to bring in Capitol. BULLISH AF!" Another user commented: "To the moon baby[.]" And user u/Jfri33ss asked whether "[t]his means buy BBBY… Right?" Complaint at ¶33.

The statements identified in Paragraphs 27 and 28 were recklessly misleading when made for, at least, the following reasons:

A)      Gove and other senior executives knew or recklessly disregarded that Cohen had lost interest in Bed Bath securities because the 2022 Credit Agreement effectively destroyed Cohen's turnaround strategy and his ultimate interest in retaining his holdings;

B)      Gove and other senior executives knew or recklessly disregarded the facts described in Paragraph 184 (A) because the Strategy Committee of the Board of Directors, which Gove chaired, and other senior executives at Bed Bath informed Cohen about the options considered for buybuy BABY's future before Cohen liquidated the entirety of his interests in Bed Bath securities; and

C)      Even if Bed Bath or Gove did not know that Cohen had already formed a plan to sell the entirety of his holdings, their failure to check whether Cohen had done so or otherwise investigate or question whether he rendered Bed Bath's statements recklessly misleading when made.

Complaint at ¶34.

### III.   STANDART OF REVIEW

"When ruling on a motion to dismiss, we may `generally consider only allegations contained in the pleadings, exhibits attached to the complaint, and matters properly subject to judicial notice.'" Id. at 899-900 (quoting _Swartz v. KPMG LLP_, 476 F.3d 756, 763 (9th Cir.2007)). Courts accept factual allegations in the complaint as true and construe the pleadings in the light most favorable to the nonmoving party. Id. at 900. A complaint should not be dismissed unless it appears beyond doubt that the plaintiff can prove no set of facts in support of the claim that would entitle the plaintiff to relief. See _Morley v. Walker_, 175 F.3d 756, 759 (9th Cir.1999). "`Dismissal without leave to amend is improper unless it is clear, upon de novo review, that the complaint could not be saved by any amendment.'" Id. (quoting _Polich v. Burlington N., Inc_., 942 F.2d 1467, 1472 (9th Cir.1991)).

### IV.   ARGUMENT

#### A.  Plaintiff sufficiently pleads claims against Gove

Defendant Sue E. Gove ("Gove") served as the interim CEO of Bed Bath from June 2022 to October 2022. Gove was appointed as the permanent CEO of Bed Bath in October 2022. Since May 2019, Gove has also served as a member of the Company's Board of Directors, including as the Chair of the Strategy Committee of the Board of Directors from March 2022 to June 2022. The Strategy Committee was responsible for evaluating the Company's options for buybuy BABY's future. Complaint at ¶12.

As the Interim CEO of Bed Bath in August 2022, Sue E. Gove had ultimate authority over the statements identified in the complaint, and authorized their release and dissemination. In

June 2022, just before her appointment as Interim CEO, Bed Bath entered into a settlement agreement for past improper practices acknowledging its CEO's "responsibility to oversee the accuracy, completeness and timeliness" of "material public disclosures made by Bed Bath to its security holders or the investment community." The settlement agreement, which Bed Bath posts on the corporate governance portion of its website, also requires the CEO and CFO to comply with policies and procedures set by a Disclosure Committee "to ensure that information required to be disclosed by Bed Bath in its filings with the SEC and other material information that Bed Bath discloses to the investment community is reported accurately and timely." Thus, Gove's specific responsibilities required her to oversee the contents of the August 17, 2022 emailed statement to CNBC and the August 18, 2022 Form 8-K. In addition, Gove, as Chairman of the Strategy Committee until July 2022, knew that material, nonpublic information about Bed Bath was shared with Cohen. Complaint at ¶31.

Gove and other senior executives knew or recklessly disregarded that Cohen had lost interest in Bed Bath securities because the 2022 Credit Agreement effectively destroyed Cohen's turnaround strategy and his ultimate interest in retaining his holdings. Gove and other senior executives knew or recklessly disregarded the facts described in Paragraph 184 (A) because the Strategy Committee of the Board of Directors, which Gove chaired, and other senior executives at Bed Bath informed Cohen about the options considered for buybuy BABY's future before Cohen liquidated the entirety of his interests in Bed Bath securities. Even if Bed Bath or Gove did not know that Cohen had already formed a plan to sell the entirety of his holdings, their failure to check whether Cohen had done so or otherwise investigate or question whether he rendered Bed Bath's statements recklessly misleading when made. Complaint at ¶34.

Gove participated in the operation and management of Bed Bath. Gove conducted and participated, directly and indirectly, in the conduct of the business affairs of Bed Bath. Because Gove served as Bed Bath's CEO Gove knew or recklessly disregarded the adverse non-public information that Bed Bath concealed from investors. Complaint at ¶56.

As officers and/or directors of RC Ventures and Bed Bath respectively, Cohen and Gove had a duty to disseminate accurate and truthful information, and to correct promptly any public statements, which had become materially misleading. Complaint at ¶57.

Because of their positions of control and authority as senior officers, Cohen and Gove were able to, and did, control the contents of their direct communications with investors, which Cohen and Bed Bath disseminated in the marketplace concerning RC Ventures' and Bed Bath's operations, management, financial condition and prospects. Cohen and Gove exercised their power and authority to cause RC Ventures and Bed Bath respectively to engage in the wrongful acts complained of herein. Cohen and Gove, therefore, were "controlling persons" of RC Ventures and Bed Bath respectively within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Bed Bath's securities. Complaint at ¶58.

By reason of their senior management positions and/or being controlling persons of RC Ventures or Bed Bath, Cohen and Gove had the power to direct the actions of, and exercised the same to cause, RC Ventures and Bed Bath to engage in the unlawful acts and conduct complained of herein. Each of these Defendants exercised control over the general operations of RC Ventures or Bed Bath and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff complains. Complaint at ¶59.

12

On August 17 and 18, 2022, in response to media inquiries about the disclosure of Cohen's Form 144, BBBY made two false and misleading statements. In both, BBBY represented: "We were pleased to have reached a constructive agreement with RC Ventures in March and are committed to maximizing value for all shareholders." These statements were misleading because they omitted to disclose that Cohen had already formed a plan to liquidate his interest and, in fact, had already liquidated the vast majority, if not all of his interest before these statements were made. As a result, the agreement with RC Ventures was not constructive at that time. Nor could it be, given that the plain meaning of the word is productive, helpful, handy or useful. In that context, BBBY's description of the agreement with RC Ventures as "constructive" – without disclosure of Cohen's plan or proposal – would mislead a reasonable investor. The reference to a "constructive agreement" signaled the exact opposite of the actual broken relationship at the time of the statement. It would also signal that Cohen remained a substantial BBBY investor, since a wholesale divestiture by Cohen would of course mean that his relationship with BBBY's was no longer constructive. "We "must consider the complaint in its entirety" and decide "whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard" _Ind. Pub. Ret. Sys. v. Pluralsight, Inc._, 45 F.4th 1236, 1267 (10th Cir. 2022).

Gove either knew that Cohen and RC Ventures formed a plan to sell, and had sold his holdings or recklessly disregarded the risk of misleading investors about Cohen's plan to sell, and actual sale. see _Glazer Capital Mgmt., L.P. v. Forescout Techs., Inc_, 2023 U.S. App. LEXIS 6285, at *31-32 (warning that courts cannot "comingle" the lower standard for falsity

BBBY's statements cannot be mischaracterized as puffery when reasonable investors

did, in fact, interpret the Company's statements as a highly significant endorsement of its positive relationship with Cohen and an indication that Cohen continued to hold his shares. ¶183; see also supra at 51-52; SEC v. Rio Tinto PLC, No. 17-cv-7994 (AT), 2019 U.S. Dist. LEXIS 43986, at *35-37 (S.D.N.Y. Mar. 18, 2019) (statement that project had significant future potential was not puffery as it was sufficiently alleged that the speaker had reason to believe the project actually had no potential). Again, BBBY ignores these well-pleaded allegations.

## V.    ALTERNATIVELY REQUEST TO ALLOW PLAINTIFFS TO AMEND THE COMPLAINT

In the alternative, if this Court finds Plaintiff's Complaint is deficient in any way rather than dismiss or strike items within Plaintiff's Complaint or any portion thereof, Plaintiff requests the Court to allow them to amend Plaintiff's Complaint to correct any deficiencies the Court specifies. "Leave to amend a complaint should be freely given in the absence of undue delay, bad faith, undue prejudice to the opposing party, repeated failure to cure deficiencies, or futility." *Richardson v. United States*, 193 F.3d 545, 548-49 (D.C. Cir. 1999). The United States Supreme Court has declared that "this mandate is to be heeded." *Foman v. Davis*, 371 U.S. 178, 182 (1962); *Davis v. Liberty Mut. Ins. Co*., 871 F.2d 1134, 1136 (D.C. Cir. 1989). Thus, the burden is on the opposing party to show that there is reason to deny leave. *In re Vitamins Antitrust Litigation*, 217 F.R.D. 30, 32 (D.D.C. 2003). The Supreme Court explained that "if the underlying facts or circumstances relied upon by a plaintiff may be a proper source of relief, he ought to be afforded an opportunity to test his claim on the merits." *Foman*, 371 U.S. at 182. The law is well-settled that leave to amend a pleading should be denied only where there is undue delay, bad faith or dilatory motive, repeated failure to cure deficiencies by previous amendments,

undue prejudice, or futility of amendment. *Firestone v. Firestone*, 76 F.3d 1205, 1208 (D.C. Cir. 1996).

### VI.  CONCLUSION

For the foregoing reasons, Anthony Mitchell respectfully requests that the Court deny Defendant's Motion in its entirety. In the event the allegations in Plaintiff's Complaint are inadequate in any respect, Plaintiff respectfully requests an opportunity to amend his Complaint.


Dated: November 12, 2024                                    Respectfully submitted,

                                                            _____

                                                            ANTHONY MITCHELL, Pro se

## CERTIFICATE OF SERVICE

I CERTIFY that on September 16, 2024, I caused a true and correct copy of the foregoing

PLAINTIFF'S OPPOSITION TO DEFENDANT SUE GOVE'S MOTION TO DISMISS THE

COMPLAINT to be filed with the Clerk of the Court and serving on all parties of record via

email as follows:

Todd L. Bice, Esq.
TLB@pisanellibice.com
Emily A. Buchwald, Esq.
EAB@pisanellibice.com
400 South 7th Street, Suite 300
Las Vegas, Nevada 89101
Telephone: (702) 214-2100
Eric R. Swibel
LATHAM & WATKINS LLP
330 North Wabash Avenue, Ste. 2800
Chicago, Illinois 60611
Telephone: (312) 777-7185
Eric.Swibel@lw.com
Bradley Austin
SNELL & WILMER L.L.P.
1700 S Pavilion Center Drive, Suite 700
Las Vegas, NV 89135
Tel. 702.784.5200
Fax. 702.784.5252
Email: baustin@swlaw.com

Jared M. Gerber
CLEARY GOTTLIEB STEEN & HAMILTON LLP
One Liberty Plaza
New York, New York 10006
Telephone: (212) 225-2000

Email: jgerber@cgsh.com

Dated: November 7, 2024                                     Respectfully submitted,

                                                           ANTHONY MITCHELL, Pro-se



9261 5E9E 06ヤl ヤSZS E9E9 E06Z l9Z6

USPS TRACKING # eVS

USPS Deliver To:
CLERKS OFFICE
333 LAS VEGAS BLVD S
LAS VEGAS, NV 89101-7065

CARRIER - LEAVE IF NO RESPONSE

US POSTAGE PAID
UPS
eVS

USPS PARCEL SELECT

TRACKING #: 1Z 850 A77 YW 3198 7346

UPS SUREPOST

NV 8919-15 X

LAS VEGAS   NV 89106-9998

TO :   1801 N MARTIN L KING BLVD
SHIP   USPS 89101

1 LBS        DWT: 12.7.1   1 OF 1

CLERKS OFFICE
333 LAS VEGAS BLVD S
STE 1334
LAS VEGAS NV 89101

P: PD5BLA   S: NORTH      501
521 — 3420                X