Anthony Mitchell

618 Painted Opus Place

North Las Vegas, Nevada 89084

Telephone: (702) 884-0472



FILED ___ RECEIVED
___ ENTERED ___ SERVED ON
COUNSEL/PARTIES OF RECORD

APR 0 1 2026

CLERK US DISTRICT COURT
DISTRICT OF NEVADA
BY:_____DEPUTY

# UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

ANTHONY MITCHELL,

    Pro Se

      Plaintiff,

    v.

RYAN COHEN, an individual; and RC
VENTURES LLC, a Delaware limited
liability company,

      Defendants.

Case No.:

2:24-cv-01042-RFB-DJA

FIRST AMENDED
COMPLAINT

JURY TRIAL DEMANDED

## TABLE OF CONTENTS

NATURE OF THE ACTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

JURISDICTION AND VENUE . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

DEFINED TERMS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

PARTIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

THE PERSISTENT FRAUD PREMIUM: PLAIN THEORY . . . . . . . . . . . 30

MARKET EFFICIENCY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

THE COOPERATION AGREEMENT AND BOARD ACCESS . . . . . . . . 33

THE MANDATORY DISCLOSURE OBLIGATION . . . . . . . . . . . . . . . . 35

THE PRIMARY ACTIONABLE MISSTATEMENT (COUNT I) . . . . . . . 39

THE MISLEADING HALF-TRUTH (COUNT II) . . . . . . . . . . . . . . . . 46

EXCLUSIVELY POSSESSED EVIDENCE . . . . . . . . . . . . . . . . . . . 50

THE FIVE MNPI CATEGORIES . . . . . . . . . . . . . . . . . . . . . . . . . 51

THE SCHEME: FOUR INDEPENDENT ACTS OF DECEPTIVE CONDUCT ...
53

SCIENTER . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 58

RELIANCE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 64

LOSS CAUSATION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 68

DAMAGES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 74

STATUTE OF LIMITATIONS . . . . . . . . . . . . . . . . . . . . . . . . 74

PSLRA SAFE HARBOR . . . . . . . . . . . . . . . . . . . . . . . . . . . 76

COUNTS FOR RELIEF . . . . . . . . . . . . . . . . . . . . . . . . . . . 77

COUNT I: Section 10(b) -- Rule 10b-5(b) -- Section 13(d)(2) . . . . . . . . . . 77

COUNT II: Section 10(b) -- Rule 10b-5(b) -- Form 144 Half-Truth . . . . . . 80

COUNT III: Section 10(b) -- Rule 10b-5(a) and (c) -- Scheme . . . . . . . . . 86

COUNT IV: Section 20(a) -- Control Person Liability . . . . . . . . . . . . . . 90

COUNT V: Nevada Intentional Misrepresentation . . . . . . . . . . . . . . . . 92

COUNT VI: Nevada Fraudulent Concealment . . . . . . . . . . . . . . . . . 100

PRAYER FOR RELIEF . . . . . . . . . . . . . . . . . . . . . . . . . . . 103

FIRST AMENDED COMPLAINT

DEMAND FOR JURY TRIAL . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 105

VERIFICATION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 105

CERTIFICATE OF SERVICE . . . . . . . . . . . . . . . . . . . . . . . . . . . . 105

EXHIBIT INDEX . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 106

INDEX OF AUTHORITIES

CASES

Affiliated Ute Citizens of Utah v. United States,

  406 U.S. 128 (1972) . . . . . . . . . . . . . . . . . . . . . . . . 49, 65, 66, 84


Arista Records, LLC v. Doe 3,

  604 F.3d 110 (2d Cir. 2010) . . . . . . . . . . . . . . . . . . . . . . . . 54


Barmettler v. Reno Air, Inc.,

  114 Nev. 441, 956 P.2d 1382 (1998) . . . . . . . . . . . . . . 36, 37, 93, 99, 100


Basic Inc. v. Levinson,

  485 U.S. 224 (1988) . . . . . . . . . . . . . . . . . . . . . . . . 23, 64, 83, 85


Berson v. Applied Signal Tech., Inc.,

  527 F.3d 982 (9th Cir. 2008) . . . . . . . . . . . . . . . . . . . . . . . . 64


Binder v. Gillespie,

  184 F.3d 1059 (9th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . 49

FIRST AMENDED COMPLAINT

Bulbman, Inc. v. Nevada Bell,
  108 Nev. 105, 825 P.2d 588 (1992) . . . . . . . . . . . . . . . . . . . . 92

Cammer v. Bloom,
  711 F. Supp. 1264 (D.N.J. 1989) . . . . . . . . . . . . . . . . . . . . 31, 32

Dura Pharmaceuticals, Inc. v. Broudo,
  544 U.S. 336 (2005) . . . . . . . . . . . . . . . . . . . . 68, 69, 72

GAF Corp. v. Milstein,
  453 F.2d 709 (2d Cir. 1971) . . . . . . . . . . . . . . . . . . . . 36, 77

Halliburton Co. v. Erica P. John Fund, Inc.,
  573 U.S. 258 (2014) . . . . . . . . . . . . . . . . . . . . 64

In re Alphabet Inc. Sec. Litig.,
  1 F.4th 687 (9th Cir. 2021) . . . . . . . . . . . . . . . . . . . . 53, 84, 87

In re Bed Bath & Beyond Corp. Sec. Litig.,
  687 F. Supp. 3d 1 (D.D.C. 2023) . . . . . . . . . . . . . . . . . . . . 25, 29, 37, 107

In re BofI Federal Bank Sec. Litig.,
  977 F.3d 781 (9th Cir. 2020) . . . . . . . . . . . . . . . . . . . . 68, 70, 71

In re Daou Sys., Inc.,
  411 F.3d 1006 (9th Cir. 2005) . . . . . . . . . . . . . . . . . . . . 58

In re NVIDIA Corp. Sec. Litig.,

768 F.3d 1046 (9th Cir. 2014) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 64

In re Vivendi, S.A. Sec. Litig.,

838 F.3d 223 (2d Cir. 2016) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

Janus Capital Group, Inc. v. First Derivative Traders,

564 U.S. 135 (2011) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29, 43

Krogman v. Sterritt,

202 F.R.D. 467 (N.D. Tex. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

Lloyd v. CVB Financial Corp.,

811 F.3d 1200 (9th Cir. 2016) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 72

Loos v. Immersion Corp.,

762 F.3d 880 (9th Cir. 2014) . . . . . . . . . . . . . . . . . . . . . . . . . 68, 70, 71

Lorenzo v. SEC,

587 U.S. 71 (2019) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53, 87

Macquarie Infrastructure Corp. v. Moab Partners, L.P.,

601 U.S. 257 (2024) . . . . . . . . . . . . . . . . . . . . 15, 16, 36, 47, 48, 81, 82, 83

Merck & Co. v. Reynolds,

559 U.S. 633 (2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 74, 75

Metzler Inv. GMBH v. Corinthian Colleges, Inc.,

540 F.3d 1049 (9th Cir. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . 44, 76

Mineworkers' Pension Scheme v. First Solar Inc.,

881 F.3d 750 (9th Cir. 2018) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 69

Nelson v. Heer,

123 Nev. 217, 163 P.3d 420 (2007) . . . . . . . . . . . . . . . . . . . . . . . . . 100

Nevada Power Co. v. Monsanto Co.,

891 F. Supp. 1406 (D. Nev. 1995) . . . . . . . . . . . . . . . . . . . . . . 95, 101

No. 84 Employer-Teamster Joint Council Pension Trust Fund

v. America West Holding Corp.,

320 F.3d 920 (9th Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 90

SEC v. Marin,

640 F.3d 978 (9th Cir. 2011) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

SEC v. Zandford,

535 U.S. 813 (2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24, 79

South Ferry LP, No. 2 v. Killinger,

542 F.3d 776 (9th Cir. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 63

Tellabs, Inc. v. Makor Issues & Rights, Ltd.,

551 U.S. 308 (2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 59, 63, 64

TSC Indus., Inc. v. Northway, Inc.,

426 U.S. 438 (1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

United States v. Bilzerian,

926 F.2d 1285 (2d Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . 61

United States v. O'Hagan,

521 U.S. 642 (1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . 55

Vess v. Ciba-Geigy Corp. USA,

317 F.3d 1097 (9th Cir. 2003) . . . . . . . . . . . . . . . . . . . . . 53

Wellman v. Dickinson,

475 F. Supp. 783 (S.D.N.Y. 1979) . . . . . . . . . . . . . . . . . . . 11

WPP Luxembourg Gamma Three Sarl v. Spot Runner, Inc.,

655 F.3d 1039 (9th Cir. 2011) . . . . . . . . . . . . . . . . . . 53, 57, 89

Zucco Partners, LLC v. Digimarc Corp.,

552 F.3d 981 (9th Cir. 2009) . . . . . . . . . . . . . . . . . . . . . . 58

STATUTES

15 U.S.C. Section 78j(b) (Exchange Act Section 10(b)) . . . . . . . . . . . . . . 22

15 U.S.C. Section 78t(a) (Exchange Act Section 20(a)) . . . . . . . . . . . . 22, 90

15 U.S.C. Section 78aa (Exchange Act Section 27) . . . . . . . . . . . . 22, 24, 25

15 U.S.C. Section 78p(a) (Exchange Act Section 16(a)) . . . . . . . . . . . . . 45

15 U.S.C. Section 78p(b) (Exchange Act Section 16(b)) . . . . . . . . . . . . . 41

15 U.S.C. Section 78u-5 (PSLRA Safe Harbor) . . . . . . . . . . . . . . . . 44, 76

15 U.S.C. Section 78bb(f)(5)(B) (SLUSA) . . . . . . . . . . . . . . . . . . . . . 100

28 U.S.C. Section 1331 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

28 U.S.C. Section 1367 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

28 U.S.C. Section 1391(b)(2) . . . . . . . . . . . . . . . . . . . . . . . . 22, 25

28 U.S.C. Section 1658(b) . . . . . . . . . . . . . . . . . . . . . . . . . . 74, 76

Exchange Act Section 13(d) and Section 13(d)(2) ...

14, 16, 35, 39, 40, 76, 77, 79

NRS 41.141 (comparative fault) . . . . . . . . . . . . . . . . . . . . . . . 103

NRS 42.005 (punitive damages) . . . . . . . . . . . . . . . . . . 100, 103, 104

RULES AND REGULATIONS

17 C.F.R. Section 240.10b-5 (Rule 10b-5) ...

10, 16, 17, 36, 38, 47, 48, 57, 77, 78, 80, 81, 82, 83, 86, 87

17 C.F.R. Section 240.13d-2(a) ...

11, 13, 14, 16, 18, 35, 38, 40, 43, 45, 49, 77, 93, 95, 101

SEC Rule 10b5-1(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . 18, 39, 81

SEC Regulation SHO, Rule 203(b)(1) . . . . . . . . . . . . . . . . . . . . . 11

SEC Rule 15c6-1(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 12

SEC Rules 17a-3 and 17a-4 . . . . . . . . . . . . . . . . . . . . . . . . 10, 11

Federal Rule of Civil Procedure 8(d)(2) ...

14, 16, 17, 29, 34, 43, 78, 80, 90, 92, 100

Federal Rule of Civil Procedure 9(b) . . . . . . . . . . . . . . . . . . . . . 53

FINRA Rules 3110, 3120, 4320, 5270 . . . . . . 10, 11, 12, 13, 45, 54, 60, 66, 87

NATURE OF THE ACTION

FIRST AMENDED COMPLAINT

1. On March 7, 2022, RC Ventures LLC -- acting through Ryan Cohen, its sole member, sole manager, and sole officer -- filed a Schedule 13D (Exhibit A) with the Securities and Exchange Commission. Item 4 of that original Schedule 13D stated: "No Reporting Person has any present plan or proposal which would relate to or result in any of the matters set forth in subparagraphs (a)-(j) of Item 4 of Schedule 13D except as set forth herein." The "except as set forth herein" clause incorporated Item 4's generic contingency language acknowledging that Cohen "may endeavor to increase or decrease" his position through future transactions "depending upon overall market conditions, other investment opportunities available to the Reporting Persons, and the availability of Shares at prices that would make the purchase or sale of Shares desirable." Subparagraph (a) of Item 4 of Schedule 13D covers the acquisition or disposition of the issuer's securities. Item 4 thus disclosed a generic, conditional possibility of future transactions depending on circumstances not yet materialized -- but it disclosed no specific, present plan to execute a pre-arranged institutional liquidation. That filing was operative on EDGAR from the date of its filing.

RC Ventures LLC, through its principal Ryan Cohen, made three Schedule 13D filings with respect to its position in Bed Bath & Beyond Inc.: the original Schedule 13D filed March 7, 2022 (Exhibit A), Amendment No. 2 filed August 16, 2022 at 9:16 a.m. (Exhibit E), and Amendment No. 3 filed August 18, 2022 (Exhibit F), which disclosed that the entire position had been sold. The central timing question this case presents is whether a $178 million institutional block trade -- requiring prime broker engagement, compliance review, and coordinated bookbuilding across institutional counterparties -- could have been arranged in the interval between the 9:16 a.m. filing on August 16, a sale that commenced that same afternoon and continued on August 17, and the August 18 disclosure

that the entire $178 million position had been sold. Charts 1 and 2 below set out the standard, sequential compliance and bookbuilding steps that govern a transaction of this size. Those steps are inconsistent with overnight arrangement and support the inference that the JP Morgan engagement was underway before Amendment No. 2 was certified and filed.

## CHART 1 -- PRIME BROKER COMPLIANCE STACK

Standard Sequential Steps for a $178 Million Institutional Block Trade (Each Step Ordinarily Requires Independent Action by Separate Institutional Personnel During Business Hours)

| STEP | COMPLIANCE REQUIREMENT | REGULATORY / INSTITUTIONAL BASIS | TYPICAL TIME |
|---|---|---|---|
| 1 | Issuer Pre-Clearance | Insider must obtain written approval from the issuer's general counsel or compliance officer under the company's insider trading policy before initiating any sale. Exchange Act § 10(b); Rule 10b-5; BBBY Corporate Governance Guidelines § 1(d); BBBY Insider Trading Policy (EDGAR-filed); BBBY EX-10.1 p.138 -- each confirming issuer pre-clearance requirements applicable to directors and 10%+ beneficial owners | 48 hours |
| 2 | Prime Broker Material Nonpublic Information ("MNPI") Screen | Compliance department checks restricted list and watch list; formal information barrier review; wall-crossing determination if firm possesses MNPI about issuer. FINRA Rule 3110 (Supervision); FINRA Rule 5270 (front-running); Exchange Act § 15(g) (MNPI compliance procedures); SEC Rules 17a-3 and 17a-4 (books and records; review must be documented) | 1–3 bus. days |
| 3 | Prime Broker Credit and Risk Approval | Risk desk calculates net settlement exposure; $178M position triggers escalation above trader discretionary limit; senior risk management sign-off required. NSCC Collateral Monitor (real-time); Net Debit Cap constraints; internal risk escalation protocols; NSCC Rules and Procedures, Addendum A (Required Deposit formula) | 1–2 bus. days |

| 4 | Schedule 13D/A Amendment | Decision to dispose constitutes a material change in "plans or proposals" (Item 4), triggering an immediate amendment obligation that must be filed before or contemporaneously with execution. 17 C.F.R. § 240.13d-2(a) (prompt amendment on material change); SEC CDI, Regulation 13D-G, Question 110.06 (plan-or-intention trigger for Item 4); Wellman v. Dickinson, 475 F. Supp. 783 (S.D.N.Y. 1979) | 1–2 bus. days |
| 5 | Reg SHO Pre-Borrow Locate (where applicable) | Where the prime broker facilitates via a short-sale component, broker must locate and confirm available securities borrow before execution. SEC Reg. SHO, Rule 203(b)(1) (locate requirement); FINRA Rule 4320 (delivery); State Street, BNY Mellon, JPMorgan require 24–48 hours advance notice for large lending arrangements | 1–3 bus. days |
| 6 | DTCC/NSCC Margin Pre-Positioning | Clearing member must post additional Required Deposit to cover new net settlement exposure before execution; collateral transfer to DTCC settlement account required. NSCC Required Deposit formula; Net Debit Cap; Collateral Monitor; T+2 settlement cycle (SEC Rule 15c6-1(a)) means collateral must be pre-positioned before execution | 1–2 bus. days |
| 7 | Written Block Desk Mandate | Formal written or recorded instruction specifying size, price parameters, confidentiality, and timing required to establish audit trail at execution. SEC Rules 17a-3 and 17a-4 (broker-dealer books and records; sequence of compliance approvals must be documented); FINRA Rule 3110 | 4–8 hours |

# CHART 2 -- UPSTAIRS MARKET STANDARD STEPS

Institutional Bookbuilding Mechanics for a $178 Million Block Trade

(Sequential Search Is Standard Institutional Practice; Simultaneous Solicitation Would Materially Increase Information Leakage and Compliance Risk)

| STEP | REQUIRED ACTION | INSTITUTIONAL / ACADEMIC BASIS | TYPICAL TIME |
| --- | --- | --- | --- |

| 1 | Counterparty Identification | Block desk contacts 3–6 potential institutional buyers sequentially -- rather than simultaneously -- to prevent information leakage that would cause price decline before execution. Seppi (1990), "Equilibrium Block Trading and Asymmetric Information," J. Finance 45(1):73–94 (theoretical basis for sequential search); Keim & Madhavan (1996), Rev. Fin. Studies 9(1):1–36 (empirical confirmation; multiple trading sessions per block) | 2–4 bus. days |
| 2 | Indication of Interest (IOI) | Each contacted institution submits a non-binding indication of the quantity it can absorb and at what discount. Cannot be compelled; cannot be rushed without broadcasting the sale. Each institution requires 4–24 hours to consult internally before responding; simultaneous solicitation risks broker front-running (FINRA Rule 5270) and information leakage that could constitute market manipulation under Exchange Act §§ 9(a)(2) and 10(b) | 1–3 bus. days |
| 3 | Buyer-Side Institutional Approval | Each committed buyer must obtain investment committee approval, portfolio manager authorization, and internal compliance sign-off before committing capital. Major institutional asset managers (Fidelity, BlackRock, Vanguard, PIMCO) require 24–48 hours minimum for a new $50M+ position; full committee review often 1 week. Buyer cannot waive its own compliance review | 1–5 bus. days |
| 4 | Bookbuilding and Price Negotiation | IOIs aggregated; block priced at negotiated discount (typically 2–8% below current market); final allocation confirmed across all counterparties simultaneously. Ananth Madhavan & Minder Cheng, In Search of Liquidity: Block Trades in the Upstairs and Downstairs Markets, 10 Rev. Financ. Stud. 175 (1997) (reporting approximately 2–5 trading days from mandate to execution for trades of this magnitude) | 1–2 bus. days |
| 5 | DTC Custodian Confirmation | Seller and buyer custodians confirm trade via DTC Institutional Delivery (ID) system; both custodians must be pre-alerted; unmatched confirmations result in settlement failure. DTC Institutional Delivery operational procedures; custodians require advance notice of large block trades; confirmation typically takes 4–8 hours; same-day custodian confirmation requires pre-arrangement | 4–8 hours |
| 6 | T+2 Settlement and Delivery | Seller delivers physical shares via DTC; NSCC Required Deposit funded; net money settlement completed two business days after trade date. SEC Rule 15c6-1(a) (T+2 standard settlement cycle, applicable August 2022); NSCC Required Deposit must be funded before market open on settlement date; clearing member must have pre-positioned collateral two business days in advance | 1 bus. day |

Chart 2 illustrates the sequential, multi-step bookbuilding process that governs every large upstairs block trade. A $178 million liquidation requires sequential --

FIRST AMENDED COMPLAINT

not simultaneous -- solicitation of institutional counterparties (Seppi (1990); Keim and Madhavan (1996)). FINRA Rule 5270 prohibits broker-dealers from trading on knowledge of a pending block order; Exchange Act §§ 9(a)(2) and 10(b) prohibit market manipulation in connection with a sale. Compressing this bookbuilding into a single overnight window is difficult to reconcile with these sequential-search mechanics without implicating each of these prohibitions. Cohen's filing of Amendment No. 2 at 9:16 a.m. on August 16, 2022 -- amending only Item 5, leaving Item 4 unamended -- is therefore difficult to reconcile with a liquidation that, under standard institutional practice, required days of sequential counterparty solicitation to have already been underway.

On August 16, 2022, at 9:16 a.m. EST, RC Ventures filed Amendment No. 2 ("13D/A #2," Exhibit E). Under 17 C.F.R. § 240.13d-2(a), a Schedule 13D amendment includes only the items being changed; items not included in an amendment remain as previously filed. Amendment No. 2 amended only Item 5. It contained no Item 4. By filing Amendment No. 2 without any amendment to Item 4, Cohen left the operative Exhibit A Item 4 Representation -- "No Reporting Person has any present plan or proposal which would relate to or result in any of the matters set forth in subparagraphs (a)-(j) of Item 4 of Schedule 13D except as set forth herein" -- as the uncorrected public-facing representation on EDGAR from March 7, 2022 through his completed liquidation, conveying to the market that his plans remained as previously described: generic contingencies, no specific present plan. The deliberate non-amendment of Item 4 was not a neutral omission: it was a regulatory failure to disclose -- as required by 17 C.F.R. Section 240.13d-2(a) -- the material change from those disclosed generic contingencies to a specific, pre-arranged, complete liquidation of Cohen's entire BBBY position -- approximately 9,450,000 shares and 2,350,000 call options with an aggregate value of

FIRST AMENDED COMPLAINT

approximately $178 million -- through an institutional block trade with JP Morgan Securities LLC that commenced later on August 16, 2022 and continued into August 17, 2022. A transaction of this magnitude is highly inconsistent, under standard institutional compliance practice, with having been arranged in the hours after 9:16 a.m., giving rise to a strong inference that the JP Morgan engagement existed before Amendment No. 2 was filed, and that Cohen's failure to amend Item 4 was therefore knowing (see Charts 1 and 2, ante, documenting the mandatory compliance and bookbuilding steps required for an institutional block trade of this magnitude). This regulatory non-amendment theory is the foundation of Count I. Count II, pleaded in the alternative under Rule 8(d)(2), rests on the half-truth doctrine. Count I rests on the Section 13(d)(2) regulatory duty to disclose material changes in previously reported information: under 17 C.F.R. § 240.13d-2(a), any material change in information previously reported in a Schedule 13D requires prompt amendment. The crystallization of the generic disclosed contingencies in Item 4 -- conditional possibilities of future transactions depending on market conditions, not constituting a specific present plan -- into a specific, pre-arranged, $178 million institutional block trade through JP Morgan Securities LLC is precisely the material change that Section 13(d)(2) required Amendment No. 2 to disclose. It disclosed nothing. That failure left the market with the false impression that Cohen's plans remained as previously described: generic contingencies, no specific present plan. Count II rests, in the alternative under Federal Rule of Civil Procedure 8(d)(2), on the half-truth doctrine: on August 16, 2022, contemporaneously with the Amendment No. 2 filing, Cohen signed and submitted a Form 144 certification (Exhibit D) in which he swore "he does not know any material adverse information in regard to the current and prospective operations of the Issuer of the securities to be sold which has not been publicly disclosed." Unlike the Item 4 language, the Form 144 certification contains no "except as set forth herein"

qualifier -- it is an unqualified, categorical statement. That certification was a half-truth: Cohen possessed five categories of material nonpublic information about BBBY at the time of sale, rendering the certification materially misleading by omission under Macquarie Infrastructure Corp. v. Moab Partners, L.P., 601 U.S. 257 (2024). Count II is an independent alternative theory; it does not depend on Count I succeeding, and Count I's material change theory does not depend on the half-truth doctrine.

2. The fraud was never fully corrected. As set forth in Paragraphs 5-7 below, the August 18 disclosure revealed that Cohen sold. It did not reveal the pre-arrangement, the MNPI categories, the falsity of the Form 144 certification, or the denominator manipulation. The 52% decline priced Cohen's departure. It could not price facts the market never received. The Item 4 Representation -- "No Reporting Person has any present plan or proposal which would relate to or result in any of the matters set forth in subparagraphs (a)-(j) of Item 4 of Schedule 13D except as set forth herein" -- was never amended to disclose the material change in Cohen's plans, and was never retracted or explained by Defendants through the filing of this First Amended Complaint.

3. The specific, discrete, verifiable fact that Cohen's liquidation was pre-arranged with JP Morgan Securities LLC before the 9:16 a.m. Amendment No. 2 filing has never been disclosed by Defendants in any public filing identified here. It was not disclosed on August 16 or August 18, 2022, or on any subsequent date through the filing of this First Amended Complaint. Later events revealed concealed deterioration and related risks, but never disclosed the specific pre-arrangement fact itself. Because it was never disclosed, the efficient market never priced it. Because it was never priced, market prices during

Plaintiff's purchase period reflected an incomplete premise: that Cohen's exit was a spontaneous portfolio decision rather than a pre-arranged liquidation executed by an insider possessing board-level knowledge of BBBY's path to insolvency. Under 17 C.F.R. § 240.13d-2(a), Cohen's voluntary filing of the Item 4 contingency representation created a regulatory duty to promptly disclose any material change in the information previously reported therein. When the generic contingencies of Item 4 crystallized into a specific, pre-arranged $178 million block trade, that crystallization constituted precisely the material change that Section 13(d)(2) required disclosure of -- a duty that arises directly from the regulation and operates independently of any half-truth doctrine.

4. This First Amended Complaint asserts six claims:

Count I (Section 10(b) / Rule 10b-5(b)): Cohen failed to disclose, in Amendment No. 2 (Exhibit E), the material change in his previously reported plans -- the crystallization of the generic Item 4 contingencies into a specific, pre-arranged, $178 million institutional block trade through JP Morgan Securities LLC -- in violation of 17 C.F.R. § 240.13d-2(a).

Count II (Section 10(b) / Rule 10b-5(b), half-truth): Cohen's Form 144 certification (Exhibit D) -- his sworn statement that he had "no knowledge of material adverse information" about BBBY -- was rendered materially misleading by the omission of five categories of material nonpublic information ("MNPI") he possessed at the time of sale. Macquarie Infrastructure Corp. v. Moab Partners, L.P., 601 U.S. 257 (2024). Count II is pleaded as an independent alternative theory under Federal Rule of Civil Procedure 8(d)(2) and does not depend on Count I succeeding.

FIRST AMENDED COMPLAINT

Count III (Rule 10b-5(a) and (c), scheme liability): Four acts of deceptive conduct -- private compliance misrepresentations to JP Morgan Securities, MNPI-informed option exercise, deliberate regulatory sequencing, and denominator manipulation -- each independent of any particular statement or omission.

Count IV (Section 20(a), control-person liability): Asserted against Cohen individually in the alternative, as set forth in ¶¶95-98.

Counts V and VI (Nevada intentional misrepresentation and fraudulent concealment): Pleaded in the alternative under Fed. R. Civ. P. 8(d)(2). Count V is grounded in Cohen's voluntary EDGAR content -- the Item 4 Representation that remained operative because Amendment No. 2 amended only Item 5, leaving Item 4 unchanged. Count VI encompasses the full course of Cohen's related misrepresentations and omissions, as set forth in ¶¶108-115.

WHAT AUGUST 18, 2022 CORRECTED -- AND WHAT IT DID NOT

5. On August 18, 2022, Ryan Cohen's complete sale of his Bed Bath & Beyond Inc. ("BBBY") position was disclosed (Exhibit F). BBBY's stock dropped approximately 52%. The August 18 disclosure was not a full corrective disclosure. It told the market one fact: Cohen sold. The following five facts -- each independently material, each necessary to make the fraud visible -- were not disclosed on August 18 or on any date through the filing of this First Amended Complaint:

(a) The pre-arrangement. Whether Cohen's $178 million liquidation was arranged with JP Morgan Securities LLC before he filed Amendment No. 2 at 9:16 a.m. on August 16, 2022, without amending Item 4 to disclose the material change in plans required by 17 C.F.R. § 240.13d-2(a). The 13D/A #3 disclosed the completed sale. It said nothing about when the arrangement began.

(b) The MNPI. The five specific categories of board-level material nonpublic information Cohen possessed when he certified on Form 144 that "he does not know any material adverse information": supplier payment failures, asset-based lending ("ABL") facility deterioration, buybuy BABY strategic nonviability, imminent store closures and workforce reduction, and the Cooperation Agreement's documented information pipeline.

(c) The false Form 144 certification (Exhibit D). The last page of the Form 144, bottom right corner, contains an "ATTENTION" block stating: "The person for whose account the securities to which this notice relates are to be sold hereby represents by signing this notice that he does not know any material adverse information in regard to the current and prospective operations of the Issuer of the securities to be sold which has not been publicly disclosed. If such person has adopted a written trading plan or given trading instructions to satisfy Rule 10b5-1 under the Exchange Act, by signing the form and indicating the date that the plan was adopted or the instruction given, that person makes such representation as of the plan adoption or instruction date." Cohen signed this certification. His sworn statement that "he does not know any material adverse information" about BBBY that had not been publicly disclosed was never retracted or corrected.

(d) The undisclosed material change in plans: 13D/A #2 (Exhibit E) filed without

any Item 4 amendment, leaving the Item 4 contingency representation operative without disclosing the crystallization of those contingencies into a specific pre-arranged block trade. The 13D/A #3 disclosed that Cohen's plans had in fact changed. It did not disclose that a block trade had been pre-arranged before the 13D/A #2 filing, nor that Amendment No. 2's failure to amend Item 4 had concealed that material change from the market.

(e) The denominator manipulation. Cohen's reported 9.8% ownership used a stale share count. His actual beneficial ownership was approximately 11.8% -- above the Section 16(b) disgorgement threshold.

6. The 52% decline priced the surprise of Cohen's departure. It could not price facts the market never received. The market learned Cohen sold; it did not learn during Plaintiff's purchase period that the sale had allegedly been pre-arranged before the no-change Amendment No. 2 filing and informed by concealed adverse information. Those are different facts. An efficient market prices the first instantly. It cannot price the second because the second was never disclosed by Defendants.

6A. Plaintiff Anthony Mitchell, a retail investor domiciled in North Las Vegas, Nevada, purchased approximately 11,947 shares of BBBY common stock between January 19 and April 19, 2023 -- five months after the incomplete August 18, 2022 disclosure -- at prices ranging from $0.45 to $3.96 per share. During the same period, Plaintiff sold approximately 3,100 shares, resulting in a net position of approximately 8,847 shares. Throughout Plaintiff's purchase period, the Item 4 Representation remained unamended on EDGAR, the Form 144 certification remained uncorrected, and the pre-arrangement, MNPI categories, and denominator manipulation remained undisclosed. On April 23,

2023 -- four days after Plaintiff's last purchase -- BBBY filed for Chapter 11 bankruptcy. Plaintiff's remaining 8,847 shares were rendered worthless and removed from his brokerage account on October 18, 2023. Plaintiff's total net out-of-pocket losses are approximately $23,400. This action seeks the fraud-related inflation component of those losses -- i.e., the specific premium Plaintiff paid above the price that would have prevailed had the pre-arrangement, MNPI, and related facts been disclosed -- to be quantified by event study methodology at trial.

## THE STEPWISE CORRECTION MAP

Jan 5–Apr 19, 2023

7. The following table sets forth corrective disclosures and contextual market events during and immediately preceding Plaintiff's purchase period (January 5 through April 23, 2023). DOWN rows mark corrective disclosures -- each revealing a specific MNPI category Cohen possessed and concealed at the time of his August 16, 2022 Form 144 certification. UP rows confirm the fraud premium's persistence during temporary relief periods. See also Exhibit G (complete stock-price chronology).

| DATE | DISCLOSED FACT | CONCEALED FACT | PRICING CONSEQUENCE |
|---|---|---|---|
| (DOWN) Jan 5, 2023 | Going-concern warning (BBBY 8-K, SEC EDGAR Acc. No | 0001193125-23-002004). Cohen knew of liquidity crisis in Aug 2022 (Category B MNPI) | Approximately 30% decline; market surprised by severity. Precedes Plaintiff's first purchase; included as contextual evidence that fraud premium persisted into purchase period |

| | | | |
|---|---|---|---|
| (DOWN) Jan 25-26, 2023 | ABL facility accelerated by JP Morgan Chase Bank (BBBY 10-Q, SEC EDGAR Acc. No | 0000886158-23-000026). JP Morgan (Cohen's execution broker's affiliate) was the lender; Cohen knew ABL was deteriorating (Category B) | Approximately 22% decline; proves market had not priced ABL deterioration Cohen possessed |
| (DOWN) Feb 1, 2023 | Missed interest payment on senior secured notes (disclosed in Feb 7 8-K, SEC EDGAR Acc. No | 0001193125-23-027117). Categories A and B -- supplier payment failures and liquidity crisis that Cohen possessed at Form 144 certification | Confirms continued revelation of concealed information |
| (DOWN) Feb 7-8, 2023 | buybuy BABY strategic alternative abandoned; dilutive offering and 95M+ warrants announced (BBBY 8-K, SEC EDGAR Acc. No | 0001193125-23-027117). Cohen championed this deal publicly through the Cooperation Agreement while knowing it was not viable (Categories C and D) | Approximately 48% decline; proves market had not priced Category C MNPI |
| (UP) Mar 15, 2023 | Cohen files motion to dismiss in D.D.C | asserting Form 144 certifications were accurate. Pre-arrangement still undisclosed; Cohen actively defends false narrative | Fraud-uncertainty premium maintained through purchase period |
| (DOWN) Mar 30, 2023 | ATM offering and bankruptcy warning (BBBY 8-K, SEC EDGAR Acc. No | 0001193125-23-084725). Categories A, B, and D -- operational and liquidity crisis that Cohen possessed | Material decline; confirms continued market surprise |
| (DOWN) Apr 11, 2023 | Dilutive S-1 registration statement filed (SEC EDGAR Acc. No | 0001193125-23-097982). Categories A, B, and D | Confirms ongoing revelation of concealed information |
| (DOWN) Apr 23, 2023 | BBBY files Chapter 11 bankruptcy (8-K filed Apr 24, 2023, SEC EDGAR Acc | No. 0001193125-23-111754) | Terminal materialization of all five MNPI categories. All "material adverse information" Cohen denied possessing -- supplier failures, liquidity collapse, buybuy BABY failure, store closures, and the pre-arranged liquidation -- confirmed as real and concealed |

Each DOWN row corresponds to the market's discovery of a specific category of concealed information. Each price reaction confirms the market was surprised -- proving the information had not been priced on August 18 or any date before. If August 18 had been a full correction, these disclosures would have produced no material reactions. The detailed loss causation tracks are set forth in Paragraphs

FIRST AMENDED COMPLAINT

59-62.

JURISDICTION AND VENUE

8. This Court has subject-matter jurisdiction under 28 U.S.C. Section 1331 (federal question -- Counts I through IV arise under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. Sections 78j(b) and 78t(a)) and supplemental jurisdiction under 28 U.S.C. Section 1367 (Counts V and VI arise under Nevada common law and share a common nucleus of operative fact with the federal claims).

9. Venue is proper in this District pursuant to 28 U.S.C. Section 1391(b)(2) and Section 27 of the Securities Exchange Act of 1934, 15 U.S.C. Section 78aa, which authorizes suit in any district "wherein any act or transaction constituting the violation occurred." See SEC v. Marin, 640 F.3d 978, 986 (9th Cir. 2011) (Section 78aa venue satisfied where activities in furtherance of the violation occurred in the district). A substantial part of the events and omissions giving rise to the claims occurred in this District, and acts and transactions constituting the alleged violations occurred herein. Specifically:

(a) PURCHASE DECISIONS AND TRANSACTIONS IN THIS DISTRICT: Plaintiff made each investment decision to purchase BBBY securities while physically present and domiciled in this District. Each such purchase was executed through Plaintiff's Robinhood brokerage account, registered to Plaintiff's Nevada address, while Plaintiff was physically present in this District.

FIRST AMENDED COMPLAINT

Each order was entered from Nevada, and each order confirmation was received in Nevada. Each purchase was executed in this District at a price allegedly affected by the operative misrepresentation -- specifically, the original Item 4 Representation left operative by the August 16 filing sequence -- and thus forms a substantial part of the events giving rise to Plaintiff's claims.

(b) RELIANCE IN THIS DISTRICT: The fraud-on-the-market mechanism under Basic Inc. v. Levinson, 485 U.S. 224 (1988), operated at the moment and place of purchase: it is in Nevada that Plaintiff consulted the market price -- itself inflated by the Item 4 Representation left uncorrected by the August 16 filing sequence -- and transacted at those inflated prices. The reliance element of the violation was completed in this District.

(c) INJURY IN THIS DISTRICT: Plaintiff's economic injury -- the loss of funds paid through his Nevada-domiciled brokerage account at prices inflated by the fraud -- was suffered in Nevada. The injury element of the violation was completed in this District.

(d) MARKET EFFECTS DIRECTED INTO THIS DISTRICT (COUNT I -- 13D/A NON-AMENDMENT): Defendants' false and misleading Amendment No. 2 filing was filed on SEC EDGAR as a nationally disseminated public filing, directed to all market participants nationally including those in Nevada. The pricing effect of the unamended Item 4 contingency representation operated through the efficient market mechanism at the moment and place of each Nevada purchase transaction: the fraud premium embedded in BBBY's market price by the uncorrected filing was realized at the point of each Nevada order execution.

(e) FORM 144 FALSE CERTIFICATION DIRECTED INTO THIS DISTRICT

(COUNT II): On August 16, 2022, Cohen filed a Form 144 (Exhibit D) certifying that "he does not know any material adverse information in regard to the current and prospective operations of the Issuer of the securities to be sold which has not been publicly disclosed." That certification was filed on EDGAR as a nationally disseminated public filing directed to all market participants, including those in Nevada. The Form 144 certification operated independently of the 13D/A #2 non-amendment to maintain the fraud premium in BBBY's market price: Cohen's categorical denial of MNPI knowledge reinforced the market's understanding that his August 16-17 sale was a routine portfolio decision rather than an MNPI-informed liquidation. The pricing effect of that false certification was realized at the point of each of Plaintiff's Nevada purchase transactions during the January 19 through April 19, 2023 purchase period, because the certification was never corrected or withdrawn. Count II's venue nexus to this District is independently sufficient under 15 U.S.C. Section 78aa.

(f) SCHEME ACTS DIRECTED INTO THIS DISTRICT (COUNT III): Each of the four independent scheme acts alleged in Paragraphs 44-47A -- (i) private JP Morgan compliance misrepresentations that enabled the block trade execution, (ii) MNPI-informed option exercises, (iii) deliberate regulatory sequencing designed to conceal the pre-arrangement, and (iv) denominator manipulation to conceal Cohen's above-10% beneficial ownership -- produced market effects that were directed into and realized in this District. Each scheme act contributed to the fraud premium embedded in BBBY's market price at the moment and place of each of Plaintiff's Nevada purchase transactions. The deceptive conduct constituting Count III occurred "in connection with" the purchase or sale of securities within this District. See SEC v. Zandford, 535 U.S. 813, 820 (2002). Count III's venue nexus to this District is independently sufficient under 15 U.S.C. Section 78aa.

(g) ACTIVE CONCEALMENT DURING PURCHASE PERIOD DIRECTED INTO THIS DISTRICT: On March 15, 2023 -- during Plaintiff's purchase period -- Cohen filed a motion to dismiss in In re Bed Bath & Beyond Corp. Sec. Litig., No. 1:22-cv-02541-TNM (D.D.C.), affirmatively asserting that the Form 144 certification was accurate. That filing constituted an act in furtherance of the fraud: by actively defending the false narrative in federal court while the operative EDGAR filings remained uncorrected, Cohen reinforced the market's continued reliance on the false certification and the unamended Item 4 representation, the pricing effects of which were realized in this District at the point of each of Plaintiff's subsequent Nevada purchase transactions.

(h) PER-COUNT VENUE SUMMARY: Venue under 15 U.S.C. Section 78aa is independently satisfied for each federal claim: Count I (acts and transactions constituting the 13D/A non-amendment violation, including purchase transactions at fraud-affected prices, occurred in this District); Count II (acts and transactions constituting the Form 144 half-truth violation occurred in this District); Count III (acts and transactions constituting the scheme to defraud occurred in this District); Count IV (the control person's liability derives from the primary violations for which venue is independently established).

Venue over the supplemental state law claims (Counts V and VI) is independently proper under 28 U.S.C. Section 1391(b)(2) because a substantial part of the events giving rise to those claims -- specifically, all of Plaintiff's purchase decisions, purchase transactions, and resulting economic injury -- occurred in this District. Nevada's substantive interest in adjudicating common law fraud claims brought by a Nevada domiciliary, arising from purchase transactions executed in Nevada, further supports retention of venue in this

FIRST AMENDED COMPLAINT

District.

## DEFINED TERMS

9A. For ease of reference, the following defined terms are used throughout this Complaint:

(a) "Item 4 Representation" means the affirmative contingency representation contained in Item 4 of the original Schedule 13D (Exhibit A) -- stating that "No Reporting Person has any present plan or proposal which would relate to or result in any of the matters set forth in subparagraphs (a)-(j) of Item 4 of Schedule 13D except as set forth herein" -- that remained operative on EDGAR after Amendment No. 2 (Exhibit E) amended only Item 5 without amending Item 4.

(b) "Structural Implausibility Analysis" means the analysis set forth in Paragraph 29(a), together with Charts 1 and 2, detailing (i) the prime broker institutional compliance sequence and (ii) the sequential upstairs-market bookbuilding steps required for a block trade of this magnitude.

PARTIES

10. Plaintiff Anthony Mitchell is a retail investor. (Plaintiff's current residence is North Las Vegas, Nevada 89084. The Robinhood brokerage statements reflect Plaintiff's prior mailing address in Henderson, Nevada.)

Prior to his claimed purchase period, Plaintiff purchased 500 shares of BBBY on July 15, 2022 at $4.99 per share and sold all 500 shares on August 16, 2022 -- the same day Cohen filed Amendment No. 2 -- at approximately $22.00 per share, realizing a profit of approximately $8,505. Plaintiff's exit on August 16, 2022 was precipitated by the spike in BBBY's share price that occurred before Cohen's exit was publicly disclosed. Plaintiff does not claim losses arising from these pre-purchase-period transactions; they are disclosed here for completeness and to contextualize his subsequent re-entry into BBBY.

Following the August 18, 2022 disclosure that Cohen had sold his entire BBBY position, BBBY's stock declined approximately 52%. The August 18 disclosure informed the market only that Cohen had sold. It did not disclose the pre-arranged nature of his exit, the board-level MNPI he possessed, or the falsity of his Form 144 certification. The market thus operated on an incomplete picture: Cohen appeared to have made a spontaneous portfolio decision, not a pre-arranged exit by an insider with knowledge of BBBY's path to insolvency. On that incomplete information set, Plaintiff re-entered the BBBY market on January 19, 2023 -- Plaintiff's first claimed purchase -- at $3.55 per share, based on the publicly available information about BBBY's apparent efforts to restructure and the absence of any disclosure of Cohen's pre-arrangement or the MNPI he had possessed at the time of his exit.

Between January 19, 2023 and April 19, 2023, Plaintiff purchased approximately 11,947 shares of BBBY common stock (including shares received through direct market purchases and options assignments) and sold approximately 3,100 shares during the purchase period, resulting in a net position of approximately 8,847 shares, at prices ranging from $0.45 to $3.96 per share through his Robinhood

FIRST AMENDED COMPLAINT

brokerage account, resulting in approximately $23,400 in total out-of-pocket losses. All shares were rendered worthless by BBBY's Chapter 11 bankruptcy filing on April 23, 2023, four days after Plaintiff's last purchase, and were subsequently removed as worthless from Plaintiff's brokerage account on October 18, 2023. Plaintiff's Amended Declaration is attached as Exhibit I; Plaintiff's brokerage trading records are attached as Exhibit J.

11. Defendant Ryan Cohen is an individual who, at the time of the events alleged herein, resided in Florida, and who currently resides in Florida. Cohen is the founder, sole member, and sole managing officer of RC Ventures LLC. Cohen is the only human being who could make decisions regarding RC Ventures' BBBY investment, execute instructions to JP Morgan, post communications on his personal Twitter/X account, attend compliance reviews, or possess the mental state required for the 13D/A #2 filing. Between January and August 2022, Cohen was BBBY's largest individual outside shareholder, holding shares and options representing beneficial ownership of approximately 11.8% of BBBY's outstanding common stock (using the then-current share count). Cohen entered a Cooperation Agreement with BBBY's board of directors on March 6, 2022 (Exhibit B) that, as the United States District Court for the District of Columbia found, "acknowledged that Cohen would receive material, nonpublic information." In re Bed Bath & Beyond Corp. Sec. Litig., 687 F. Supp. 3d 1 (D.D.C. 2023), Mem. Op. at 16 ("D.D.C. Opinion," Exhibit H). Cohen designated three members of BBBY's board of directors pursuant to the Cooperation Agreement. Cohen is currently the Chairman and CEO of GameStop Corp. (NYSE: GME).

12. Defendant RC Ventures LLC is a Delaware limited liability company wholly controlled by Cohen. RC Ventures held all BBBY securities, filed the

Schedule 13D and all amendments thereto, and executed the August 2022 liquidation through JP Morgan Securities LLC. RC Ventures acts solely through Cohen's personal direction and has no independent existence, employees, or decision-making capacity separate from Cohen. To the extent RC Ventures is treated as the nominal filer, Cohen is alleged in the alternative to be the Janus "maker" of each RC Ventures statement at issue in this action -- specifically, the original Schedule 13D's Item 4 Representation (Exhibit A), Amendment No. 2 (Exhibit E), and the Form 144 certification (Exhibit D) -- because he had ultimate authority over each such statement's content and whether it was communicated. Janus Capital Group, Inc. v. First Derivative Traders, 564 U.S. 135, 142 (2011). This allegation is pleaded in the alternative to RC Ventures' own primary-maker liability under Federal Rule of Civil Procedure 8(d)(2), as further set forth in Paragraph 27.

## D.D.C. JUDICIAL FINDINGS

13. On July 27, 2023, the United States District Court for the District of Columbia issued a Memorandum Opinion in In re Bed Bath & Beyond Corp. Sec. Litig., No. 1:22-cv-02541-TNM (D.D.C. Jul. 27, 2023) ("D.D.C. Opinion," Exhibit H). The D.D.C. court made the following judicial findings:

(a) Cohen's Form 144 certification (Exhibit D) was "itself misleading." D.D.C. Opinion at 15. (b) Cohen "just barely beat this bad news, which suggests he saw it coming." Id. (c) Cohen had, through the Cooperation Agreement, "acknowledged that [he] would receive material, nonpublic information." Id. at 16. (d) Cohen's post-employment Twitter post was "plausibly read as an expert insider's direction to buy or hold" BBBY. Id. at 17.

## THE PERSISTENT FRAUD PREMIUM: PLAIN THEORY

14. After August 18, 2022, BBBY's market price reflected an incomplete information set. The market knew Cohen sold. It did not know: (a) whether the sale was pre-arranged before the Amendment No. 2 filing;

(b) that Cohen possessed specific board-level MNPI at the time of his August 16 exit -- a fact that only gradually became inferable as that information became public through subsequent BBBY disclosures (Categories A-E), none of which revealed that Cohen had possessed it at the moment of his sale; or (c) that the Form 144 certification denying MNPI knowledge was false. Because these facts were never disclosed by Defendants, the market could not price them. The difference between the actual market price and the price that would have prevailed had these facts been known is the fraud premium.

15. This is not a theory that the market failed to process disclosed information. It is a theory that the market could not process information it never received. An efficient market rapidly prices what it learns (as the 52% August 18 decline confirms) and cannot price what it does not learn (as the persistent non-disclosure of the pre- arrangement confirms). These are complementary propositions: market efficiency creates the fraud premium because an efficient market that receives incomplete information produces a price reflecting that incomplete information.

16. The stepwise correction map in Paragraph 7 provides the empirical evidence. Most corrective events revealed concealed deterioration or capital-structure

risk in one of the five concealed MNPI categories Cohen possessed. Each corrective event produced a material price decline. If August 18 had been a full correction -- if the market had already priced the risk of BBBY's operational collapse -- these disclosures would have produced no material reaction. The reactions prove persistent unpriced information. Each reaction also confirms that the Item 4 Representation, left operative by the August 16 filing sequence, carried a quantifiable price premium that persisted throughout Plaintiff's purchase period and was unraveled only through the stepwise correction process.

17. The fraud premium is empirically testable. An event study quantifies each corrective disclosure's fraud-attributable price impact by measuring BBBY's abnormal return on each disclosure date -- the difference between BBBY's actual return and the return predicted by a market-model regression controlling for contemporaneous market-wide and sector-level price movements -- thereby isolating the firm-specific price decline caused by each revelation of previously concealed information. This methodology has been approved by the Second Circuit in In re Vivendi, S.A. Sec. Litig., 838 F.3d 223, 253-61 (2d Cir. 2016), and is routinely employed in securities fraud cases involving multiple partial corrective disclosures.

## MARKET EFFICIENCY

18. BBBY common stock traded on the NASDAQ Stock Market throughout the relevant period. BBBY satisfied the Cammer v. Bloom, 711 F. Supp. 1264 (D.N.J. 1989), and Krogman v. Sterritt, 202 F.R.D. 467 (N.D. Tex. 2001), factors establishing market efficiency:

(a) TRADING VOLUME: Average weekly trading volume exceeded 5% of outstanding shares throughout August 2022 through April 2023 -- substantially exceeding the Cammer threshold of 2% average weekly volume for presumptive efficiency. During the January-April 2023 purchase period, BBBY was among the most actively traded securities on NASDAQ, with average daily volume exceeding 50 million shares on multiple trading days and a market capitalization that, while declining, remained sufficient to support continuous price discovery.

(b) ANALYST COVERAGE: Multiple securities analysts followed and published research on BBBY during the relevant period, including analysts at major investment banks. During the purchase period, BBBY was the subject of extensive financial media coverage, retail investor discussion on public forums, and institutional research commentary. BBBY filed Forms 10-K and 10-Q with the SEC on a regular reporting schedule, ensuring continuous flow of material information into the public domain.

(c) FORM S-3 ELIGIBILITY: BBBY was eligible to register securities on Form S-3 and in fact conducted at-the-market equity offerings during the purchase period.

(d) RAPID PRICE REACTION: BBBY's stock price reacted rapidly and materially to each public disclosure, as the stepwise correction map in Paragraph 7 demonstrates.

(e) MARKET MAKER PRESENCE: Registered market makers maintained continuous two-sided quotes in BBBY throughout the relevant period.

FIRST AMENDED COMPLAINT

## THE COOPERATION AGREEMENT AND BOARD ACCESS

19. The Cooperation Agreement (Exhibit B), executed March 6, 2022, expressly acknowledged that Cohen would receive material nonpublic information as a condition of his board access. D.D.C. Opinion at 16. Cohen designated three BBBY board members who served as his information conduits to board-level deliberations.

20. The Cooperation Agreement (Exhibit B, §1(d)) required Cohen's board designees to "strictly adhere to the policies on confidentiality, insider trading and conflicts of interest imposed on all members of the Board." On information and belief, BBBY's insider trading policies included three standard trading restriction provisions: (i) mandatory blackout periods during which Cohen was prohibited from trading; (ii) pre-clearance provisions requiring Cohen to notify BBBY's general counsel and receive written approval before executing any BBBY securities transaction; and (iii) window-period restrictions.

The bases for these information-and-belief allegations are: (a) such provisions are standard in cooperation agreements with activist investors receiving board access, confirmed by the fact that BBBY's 2019 Cooperation and Support Agreement (SEC Acc. No. 0001193125-19-164266) with prior activist investors used identical language requiring board designees to "strictly adhere to the policies on confidentiality, insider trading and conflicts of interest imposed on all members of the Board";

(b) BBBY's fiscal Q2 2022 results were not publicly disclosed until September

FIRST AMENDED COMPLAINT

27, 2022, meaning August 16 fell within what would have been a mandatory pre-earnings blackout period; (c) whether pre-clearance was sought, granted, or denied is within Defendants' exclusive possession and control; and (d) Four additional documents confirm BBBY maintained formal trading restrictions applicable to Cohen:

First, the Cooperation Agreement itself (Exhibit B, §1(d)) expressly required Cohen's board designees to adhere to BBBY's policies on confidentiality, insider trading, and conflicts of interest -- the same language quoted in subparagraph (a) above.

Second, BBBY's FY2020 10-K stock award agreements (SEC Acc. No. 0000886158-21-000015) expressly state that blackout periods "are determined by the Company," confirming BBBY maintained formal blackout periods.

Third, BBBY's Corporate Governance Guidelines § 1(d) (April 2022) prohibited board members from transacting in Company securities while "aware of material nonpublic information."

Fourth, BBBY's Fourth Amendment to its Credit Agreement (BBBY Form 8-K filed March 30, 2023, SEC EDGAR Acc. No. 0001193125-23-084725, EX-10.1 at p.138) stated equity sales targets were suspended during "any Equity Proceeds Testing Period that occurs during a blackout period established pursuant to the Company's insider trading policy."

21. Plaintiff alleges the following alternative hypotheses under Federal Rule of Civil Procedure 8(d)(2), each of which independently supports a strong inference of scienter:

(a) FIRST ALTERNATIVE: Cohen executed the liquidation without pre-clearance in knowing violation of the Cooperation Agreement's trading restriction provisions -- including mandatory blackout periods -- while possessing board-level MNPI in the five categories identified in Paragraphs 38-42. An actor who trades without required pre-clearance while possessing disqualifying MNPI acts with awareness that his trading was improper.

(b) SECOND ALTERNATIVE: Cohen sought and obtained pre-clearance through affirmative misrepresentations to BBBY's general counsel regarding his MNPI status, inducing approval of a transaction that would not otherwise have been approved. An actor who obtains trading permission through misrepresentation to the issuer's compliance function acts with full awareness of his MNPI status and the impropriety of his conduct.

Both alternatives support the same strong inference: Cohen executed the liquidation with awareness of his MNPI status. The specific facts establishing which alternative occurred are within Defendants' exclusive possession and control, as described in Paragraph 36(c).

## THE MANDATORY DISCLOSURE OBLIGATION

22. Cohen's filing of the Schedule 13D/A was a mandatory disclosure obligation under Section 13(d) of the Securities Exchange Act and SEC Rule 13d-2. This obligation creates a duty of accuracy and completeness running to the investing market. Section 13(d)'s Item 4 disclosure field was specifically designed by Congress to enable market participants to make informed

FIRST AMENDED COMPLAINT

investment decisions about a security materially affected by a large shareholder's intentions. GAF Corp. v. Milstein, 453 F.2d 709, 720 (2d Cir. 1971). A filer who addresses his plans in Item 4 must disclose all material facts bearing on the subject of disclosure.

The duty framework operates on three levels. First, the mandatory duty: although the 13D/A filing obligation was mandatory, the specific content that remained operative in Item 4 -- the original Schedule 13D's (Exhibit A) Item 4 Representation regarding Cohen's investment plans -- was a voluntary representation Cohen made within that mandatory framework. He was required to amend it whenever a material change in his reported information occurred. Cohen's choice to file Amendment No. 2 (Exhibit E) without any Item 4 amendment -- leaving the Item 4 Representation on EDGAR without disclosing the material change in his plans -- was equally a voluntary act within the mandatory filing regime. That voluntary non-amendment gives rise to the duty to ensure the operative representation did not become materially misleading while it remained uncorrected.

Second, the half-truth duty: Under Rule 10b-5(b) and the half-truth doctrine confirmed in Macquarie Infrastructure Corp. v. Moab Partners, L.P., 601 U.S. 257, 144 S. Ct. 907 (2024), a speaker who makes an affirmative statement assumes an obligation to ensure that statement does not become materially misleading through the omission of necessary facts. This duty attaches to both the voluntary content of Item 4 and to the Form 144 certification (Exhibit D), regardless of whether the underlying filing obligation is mandatory.

Third, the state-law duty (Counts V and VI): Under Barmettler v. Reno Air, Inc., 114 Nev. 441, 956 P.2d 1382, 1386-87 (1998), a party who voluntarily speaks

assumes a duty of truthfulness to foreseeable relying parties. Plaintiff invokes this principle by analogy, acknowledging that Barmettler arose in an employment context and is offered here as persuasive authority for the state law duty element.

## THE AUGUST 12, 2022 SOCIAL MEDIA POST

23. On August 12, 2022, four days before the 13D/A #2 and Form 144 filings, Ryan Cohen personally posted to his Twitter/X account a communication to his approximately 900,000 followers (Exhibit C). In the context of Cohen's cultivated role as a provider of investment signals to his retail investor following, this communication was understood to convey an insider's bullish assessment of BBBY. The D.D.C. court found the post "plausibly read as an expert insider's direction to buy or hold." D.D.C. Opinion at 17.

24. Cohen made the August 12 post (Exhibit C) with actual knowledge that: (a) his followers would interpret it as a bullish insider signal (see Second Amended Class Action Complaint, In re Bed Bath & Beyond Corp. Sec. Litig., No. 1:22-cv-02541-TNM (D.D.C. Jan. 30, 2023), ECF No. 66, for data on Cohen's Twitter/X audience and follower behavior);

(b) he was arranging to sell his entire BBBY position based on board-level adverse knowledge; and (c) retail investors who bought or held in response would be purchasing into a market whose price did not reflect the information he possessed. Cohen knew from direct personal experience -- specifically his role as the catalyst of the GameStop retail movement -- that his social media communications directly and materially moved retail investor behavior.

25. The August 12 post serves two legal functions in this First Amended Complaint: (a) scienter evidence for Counts I and II, as contemporaneous conduct demonstrating Cohen's knowledge that his Form 144 certification was false; and (b) a component of the duty to correct theory in Count VI under Paragraph 111, as part of the series of public representations that Cohen made to his retail investor audience and subsequently failed to correct. The post is NOT the basis for the duty element of Count V: Count V's duty rests on Cohen's voluntary content -- the Item 4 Representation -- filed within a mandatory filing regime (17 C.F.R. § 240.13d-2(a)), as pleaded in Paragraph 101. The operative misrepresentation underlying Count V, and a core representation underlying Count VI, is the original Schedule 13D's (Exhibit A) Item 4 contingency disclosure -- "No Reporting Person has any present plan or proposal which would relate to or result in any of the matters set forth in subparagraphs (a)-(j) of Item 4 of Schedule 13D except as set forth herein" -- which, by operation of 17 C.F.R. § 240.13d-2(a), remained the operative, uncorrected, public-facing statement of Cohen's plans on EDGAR from March 7, 2022 through his complete August 2022 liquidation, because Cohen never amended Item 4 to disclose the material change in his plans. The facts alleged herein -- including the Structural Implausibility Analysis -- support a strong inference that Amendment No. 2's failure to disclose the material change was knowing (Count I). In the alternative, the Item 4 Representation was materially misleading by omission when Amendment No. 2 was filed (Count II). The post is NOT asserted as an independent market manipulation claim under Section 9(a)(2), it is NOT asserted as a misstatement under Rule 10b-5(b), and it is NOT asserted as a distinct scheme act under Count III.

THE PRIMARY ACTIONABLE MISSTATEMENT (COUNT I):

SECTION 13(d)(2) UNDISCLOSED MATERIAL CHANGE -- ITEM 4 (EXHIBIT A) -- CRYSTALLIZED CONTINGENCY DISCLOSURE, UNAMENDED THROUGH AUGUST 2022

LIQUIDATION --

26. On March 7, 2022, RC Ventures LLC filed its original Schedule 13D ("Schedule 13D," Exhibit A) with the SEC. Item 4 of Exhibit A stated verbatim: "No Reporting Person has any present plan or proposal which would relate to or result in any of the matters set forth in subparagraphs (a)-(j) of Item 4 of Schedule 13D except as set forth herein." Item 4(a) of Schedule 13D covers "the acquisition by any person of additional securities of the issuer, or the disposition of securities of the issuer." Critically, the "except as set forth herein" clause in Item 4 incorporated Item 4's own contingency language: "Depending upon overall market conditions, other investment opportunities available to the Reporting Persons, and the availability of Shares at prices that would make the purchase or sale of Shares desirable, the Reporting Persons may endeavor to increase or decrease their position in the Issuer through, among other things, the purchase or sale of Shares on the open market or in private transactions including through a trading plan created under Rule 10b5-1(c) or otherwise, on such terms and at such times as the Reporting Persons may deem advisable." Item 4 thus disclosed a generic contingency -- that Cohen might transact in BBBY shares depending on future market conditions -- while representing that no Reporting Person had any specific present plan or proposal to dispose of BBBY securities. This was not a blanket denial of any conceivable future sale; it was a contingency representation that

acknowledged the generic possibility of future transactions while affirmatively representing that no specific present plan existed. The critical distinction -- and the source of the 13(d)(2) duty to amend -- is the gap between "may endeavor to increase or decrease position depending on market conditions" (the disclosed contingency) and "have already engaged JP Morgan Securities LLC to execute a complete $178 million institutional block trade" (the specific present plan that Amendment No. 2 failed to disclose). That contingency representation was operative on EDGAR from the moment of its filing.

Under 17 C.F.R. § 240.13d-2(a), when a Schedule 13D amendment is filed, only the items being changed are required to be included; items not included in an amendment are not updated and remain as previously filed, continuing to operate as the filer's current public representation. On August 16, 2022, at approximately 9:16 a.m. EST, RC Ventures filed Amendment No. 2 ("13D/A #2," Exhibit E) to the Schedule 13D. Amendment No. 2 amended only Item 5. It contained no Item 4 whatsoever. By filing Amendment No. 2 without any amendment to Item 4, Cohen failed to disclose -- as required by 17 C.F.R. § 240.13d-2(a) -- the material change in his plans from the disclosed generic contingency to a specific, pre-arranged, complete liquidation of his entire BBBY position executed through JP Morgan Securities LLC. The Item 4 Representation remained on EDGAR from March 7, 2022 through and throughout Cohen's August 2022 complete liquidation without any amendment disclosing that material change. The operative misrepresentation in Count I is not language contained in Amendment No. 2; it is the failure to amend Item 4 to disclose the material change, which left the market with the false impression that Cohen's plans remained as previously described -- generic contingencies, no specific present plan. For Count II, the primary operative half-truth is the

Form 144 certification (Exhibit D) -- Cohen's unqualified statement of no MNPI knowledge, rendered misleading by five categories of material adverse information he possessed. Count II addresses only the Form 144 certification (Exhibit D) and does not rely on the Item 4 language.

26A. AMENDMENT NO. 2 AND THE SECTION 16(b) THRESHOLD -- SCHEME ELEMENT FOUR: Amendment No. 2 (Exhibit E, August 16, 2022) failed to amend Item 4 to disclose the material change in Cohen's plans -- leaving the Item 4 Representation operative on EDGAR without disclosing the crystallization to a specific pre-arranged block trade -- and had additional independent deceptive significance beyond that undisclosed material change. Section 16(b) of the Securities Exchange Act, 15 U.S.C. Section 78p(b), requires beneficial owners of more than 10% of a class of registered equity securities to disgorge short-swing profits from purchases and sales within any six-month period. Sophisticated market participants understand that a large beneficial owner who files SEC disclosures reflecting beneficial ownership above the 10% Section 16(b) threshold signals long-term investment commitment, because the disgorgement framework creates structural disincentives against short-swing trading at that ownership level.

Cohen's actual beneficial ownership of BBBY was approximately 11.8% of outstanding common stock -- above the Section 16(b) threshold. Amendment No. 2 (Exhibit E), however, reported his beneficial ownership at approximately 9.8%, using a stale share-count denominator. That reporting was false: Cohen's actual ownership remained above 10%. The specific basis for this allegation is as follows: RC Ventures held approximately 9,450,000 BBBY common shares, as reported in Amendment No. 2. The 9.8% ownership figure reported in Amendment No. 2 implies a denominator of approximately 96,428,571 shares

outstanding -- a figure consistent with the higher share count reported in BBBY's Form 10-Q for the period ended November 27, 2021 (BBBY fiscal Q3 2021, available on EDGAR). BBBY's most recent Form 10-Q as of August 16, 2022 -- for the period ended May 28, 2022 (BBBY fiscal Q1 2023, available on EDGAR) -- reported a materially lower share count, reflecting BBBY's share repurchase program. Using the then-current May 2022 outstanding share count, RC Ventures' 9,450,000 shares represent approximately 11.8% beneficial ownership. Cohen's selection of the stale November 2021 share count rather than the contemporaneous May 2022 figure was the specific mechanism by which the reported ownership percentage was artificially suppressed from 11.8% to 9.8%. Cohen's deliberate selection of a stale denominator to report just below the Section 16(b) threshold served a dual deceptive function. First, it concealed from the public the full extent of Cohen's actual 11.8% stake and its legal significance as an above-10% position. Second, it prevented the market from recognizing that Cohen, as an actual 10%+ holder, was subject to the Section 16(b) structural incentive to maintain a long-term investment posture -- a signal that would have attached to an honest above-10% disclosure. By reporting just below 10% through denominator manipulation, Cohen simultaneously obscured his actual ownership level and avoided the market commitment signal that accurate disclosure would have generated, while sophisticated investors who tracked actual share counts understood him to be a 10%+ holder with no disclosed plan to sell. The deliberate selection of the stale denominator -- reported precisely at 9.8%, just below the disgorgement threshold -- is not consistent with inadvertent error; it is consistent with awareness of the threshold's legal and market significance, and with a deliberate choice to manage the reported number. Cohen then sold his entire 11.8% position, and filed Amendment No. 3 (Exhibit F) on August 18, 2022, disclosing the completed liquidation; BBBY's stock declined approximately 52% on that date.

FIRST AMENDED COMPLAINT

27. Under Janus Capital Group, Inc. v. First Derivative Traders, 564 U.S. 135, 142 (2011), the maker of a statement is the person with ultimate authority over its content and the decision to communicate it. Ryan Cohen is the Janus maker of the operative Item 4 representation: specifically, (i) the original Schedule 13D's (Exhibit A) Item 4 Representation regarding Cohen's investment plans, and (ii) the deliberate decision to file Amendment No. 2 (Exhibit E) without any amendment to Item 4 -- the act that left that prior contingency representation operative on EDGAR under 17 C.F.R. Section 240.13d-2(a) without disclosing the material change in his plans: as RC Ventures' sole member, sole manager, and sole officer, Cohen is the only natural person who could have authorized, drafted, or approved the content of Item 4 of the 13D/A #2. For purposes of Count I, this complaint pleads two alternative theories of primary liability under Federal Rule of Civil Procedure 8(d)(2): (a) Ryan Cohen is the Janus maker of the Item 4 Representation -- having ultimate authority over (i) the content of the original Schedule 13D's Item 4 as first filed (Exhibit A), (ii) the decision to file Amendment No. 2 (Exhibit E) without any amendment to Item 4, and (iii) the resulting regulatory consequence under 17 C.F.R. § 240.13d-2(a) that the prior Exhibit A Item 4 contingency representation remained operative and unamended on EDGAR through his complete liquidation without disclosing the material change; and (b) RC Ventures LLC, as the entity that placed the false regulatory filing into the market as signatory and filer, is the primary violator as the Janus "maker" in the entity sense. These theories are alternative only as to who bears Janus primary liability; both treat the filings at issue as false or misleading statements made "in connection with" the purchase and sale of BBBY securities. Count IV is pleaded in the alternative only as to the identity of the primary violator: it is asserted on the premise that RC Ventures is the Janus

FIRST AMENDED COMPLAINT

primary maker and that Cohen, as RC Ventures' sole member, manager, and officer, exercised actual power and control over RC Ventures in connection with its primary violations. Section 20(a) liability cannot exist without an underlying primary violation; Count IV does not deny that RC Ventures committed the primary violation -- it locates derivative liability for that violation in Cohen's control.

28. This statement is a present-fact representation of Cohen's then-existing mental state. It is not a "forward-looking statement" within the meaning of the PSLRA safe harbor, 15 U.S.C. Section 78u-5. Present-fact representations of current intent are not forward-looking statements. Metzler Inv. GMBH v. Corinthian Colleges, Inc., 540 F.3d 1049, 1070 (9th Cir. 2008).

29. THE MISSTATEMENT WAS FALSE BECAUSE THE BLOCK TRADE WAS PRE-ARRANGED:

(a) BLOCK TRADE STRUCTURAL IMPLAUSIBILITY: A liquidation of $178 million in a volatile NASDAQ-listed security requires, at minimum: engagement of JP Morgan Securities' execution trading desk; negotiation of execution methodology; drafting and execution of a block trade engagement letter; coordination of the options exercise timetable with the share sale timeline; legal review of Form 4 and 13D/A #3 disclosure obligations; and compliance review for insider trading concerns. These steps involve multiple JP Morgan departments -- prime brokerage, execution trading, legal and compliance, and structured products (for the options component) -- each conducting independent internal review. The standard sequence and minimum timeframes are set forth in Charts 1 and 2, supra.

These timeframes are consistent with standard institutional practice under FINRA Rules 3110 and 3120 and applicable prime brokerage compliance protocols. Together, Charts 1 and 2 establish that arranging a transaction of this scale in the hours following the 9:16 a.m. Amendment No. 2 filing is structurally inconsistent with standard institutional practice, giving rise to a strong inference that the arrangement existed before Amendment No. 2 was filed. For a transaction of this magnitude involving a client with publicly known board-observer status, these steps would, under standard institutional practice, be expected to take multiple business days, strongly supporting the inference that the arrangement preceded the Amendment No. 2 filing. A person who filed Amendment No. 2 at 9:16 a.m. amending only Item 5 -- deliberately leaving operative on EDGAR the original Item 4 Representation -- and then commenced a fully-structured institutional liquidation the following morning had arranged that liquidation before he filed. This structural implausibility gives rise to a strong inference that the block trade was pre-arranged before the 9:16 a.m. Amendment No. 2 filing -- and therefore that the operative Exhibit A Item 4 Representation was materially false as to Cohen's plans to dispose of BBBY holdings at the moment Cohen filed Amendment No. 2 without correcting it, as required by 17 C.F.R. § 240.13d-2(a).

(b) PRE-PLANNED REGULATORY SEQUENCE: The precision of the three-document sequence -- 13D/A #2 leaving the operative Exhibit A Item 4 Representation unamended on August 16; sale execution on August 16-17; Form 4 (SEC EDGAR Accession No. 0000921895-22-002498) and 13D/A #3 (Exhibit F) disclosing completed transactions on August 18 (the last permissible filing day) -- reflects pre-planned, legally coordinated execution. Under Section 16(a) of the Securities Exchange Act, as amended by Section 403 of the Sarbanes-Oxley Act of 2002 (15 U.S.C. Section 78p(a)(2)(C)), Form 4 must be

filed within two business days of the reportable transaction. August 18, 2022 is exactly two business days after the August 16-17, 2022 sale execution. Filing on precisely the last permissible day -- rather than immediately upon completion of the sale -- is consistent with deliberate timing to control the information release window and is independent circumstantial evidence of coordinated pre-arrangement.

(c) D.D.C. JUDICIAL FINDINGS: The D.D.C. court found Cohen "just barely beat this bad news, which suggests he saw it coming" and that his Form 144 certification was "itself misleading." D.D.C. Opinion at 15-16.

(d) TEMPORAL PRECISION OF MNPI DISCLOSURE: Cohen liquidated with extraordinary precision relative to subsequent public disclosures: supplier payment failures disclosed 3 days after Form 144 certification; 150 store closures and 20% workforce reduction announced 15 days after Form 144 certification; going-concern doubt disclosed January 5, 2023; ABL default disclosed January 26, 2023; buybuy BABY abandonment February 7-8, 2023; bankruptcy April 23, 2023.

(e) JP MORGAN DUAL-CLIENT NEXUS: JP Morgan Securities LLC, Cohen's execution agent, is an affiliate of JP Morgan Chase Bank, N.A., BBBY's ABL facility lender. Cohen either disclosed his MNPI status to JP Morgan's compliance function -- confirming his knowledge -- or made false representations. Either alternative corroborates scienter.

## THE MISLEADING HALF-TRUTH (COUNT II):

FORM 144 CERTIFICATION -- OMISSION OF FIVE MNPI CATEGORIES --

CONCEALED THE PRE-ARRANGED LIQUIDATION

30. Count II is analytically independent of Count I and must be evaluated separately. Count II does not depend on whether the Item 4 Representation, carried forward unamended by 13D/A #2, was false -- that question belongs exclusively to Count I. Instead, Count II proceeds from the undisputed existence of Cohen's Form 144 certification (Exhibit D): by swearing "he does not know any material adverse information" about BBBY while possessing five categories of MNPI (Categories A-E), Cohen created a duty to ensure that certification was not materially misleading by the omission of those facts necessary to make it complete. The omitted facts -- the five MNPI categories and the pre-arrangement -- are not the logical negation of the Form 144 certification's "he does not know" statement; they are separately existing material facts whose omission transformed a literally true certification into a half-truth actionable under Rule 10b-5(b). See Macquarie Infrastructure Corp. v. Moab Partners, L.P., 601 U.S. 257, 144 S. Ct. 907 (2024). Count II thus rises or falls on the existence of the Form 144 certification and the materiality of the omitted facts -- not on whether the Item 4 language was independently false.

31. THE OMISSION: Before 9:16 a.m. on August 16, 2022, Cohen had engaged JP Morgan Securities LLC for the purpose of executing a complete liquidation of his entire BBBY position. This fact was never disclosed in the 13D/A #2, the Form 144, the Form 4, the 13D/A #3, or in any subsequent filing or communication by Cohen or RC Ventures through the date of this First

FIRST AMENDED COMPLAINT

Amended Complaint.

32. MATERIALITY: A reasonable investor would consider it highly significant that BBBY's largest individual outside shareholder had pre-arranged his complete exit while leaving operative on EDGAR the original Schedule 13D's (Exhibit A) Item 4 Representation without amending it to disclose the material change in his plans -- an exit motivated by board-level knowledge of BBBY's path to insolvency. TSC Indus., Inc. v. Northway, Inc., 426 U.S. 438, 449 (1976).

33. DUTY TO SPEAK COMPLETELY (COUNT II -- FORM 144 VEHICLE): For Count II, Cohen's duty to disclose arose from his act of making an affirmative statement: the Form 144 certification (Exhibit D) signed and filed on August 16, 2022, in which he swore "he does not know any material adverse information" about BBBY. Under Rule 10b-5(b) and the half-truth doctrine confirmed in Macquarie Infrastructure Corp. v. Moab Partners, L.P., 601 U.S. 257, 144 S. Ct. 907 (2024), when a speaker makes an affirmative statement, he assumes a duty to ensure that statement is not rendered materially misleading by the omission of facts necessary to make it complete. Cohen triggered that duty when he filed the Form 144 certification while possessing five categories of material nonpublic information about BBBY (Categories A-E) that directly contradicted the "he does not know" representation, and while having already pre-arranged his complete liquidation with JP Morgan Securities LLC -- a fact that made the "he does not know" representation materially misleading by omission. The source of Count II's duty is the Rule 10b-5(b) obligation that attaches whenever a speaker elects to speak: having spoken, he must speak completely. The Item 4/13D non-amendment theory is the subject of Count I and does not form part of

Count II's duty basis.

34. COUNT II IS PRIMARILY AN OMISSIONS CLAIM FOR AFFILIATED UTE

PURPOSES: Count II satisfies the requirement of Binder v. Gillespie, 184 F.3d 1059, 1064 (9th Cir. 1999), that a claim be "primarily" based on omissions in order to invoke the Affiliated Ute presumption of reliance. Although an affirmative statement exists -- the operative Item 4 Representation, carried forward unamended by 13D/A #2 -- the actionable wrong is not the falsity of that statement. The gravamen of Count II is the omission of five categories of material adverse information about BBBY's operations and financial condition (Categories A-E) that Cohen possessed at the time he signed the Form 144 certification. By swearing "he does not know any material adverse information" about BBBY while possessing these five categories of MNPI (Paragraphs 38-42), Cohen rendered an otherwise literally true statement materially misleading. Count II does not require Plaintiff to prove the certification was literally false -- the claim is primarily about what was withheld, not about the falsity of the affirmative statement. Count I rests on the 17 C.F.R. § 240.13d-2(a) regulatory amendment duty, and neither count requires the other to succeed. Count II requires only that the affirmative statement created a misleading impression in the absence of the omitted MNPI -- making the omission the center of gravity of the claim. Because the actionable harm flows primarily from the undisclosed MNPI categories rather than from any affirmative misrepresentation, Count II is primarily an omissions claim within the meaning of Binder and Affiliated Ute applies.

35. CONTINUING NATURE OF THE OMISSION: The pre-arrangement fact remained continuously undisclosed from August 16, 2022 through the entirety

FIRST AMENDED COMPLAINT

of Plaintiff's purchase period. It was undisclosed on August 16, 2022, on January 19, 2023, on April 19, 2023, and on every intervening date. The August 18 disclosure revealed that Cohen had sold his position; it did not disclose that the sale had been pre-arranged with JP Morgan before Cohen filed Amendment No. 2 at 9:16 a.m. on August 16, 2022. A market that received only the fact of the completed sale, without knowing whether that sale was pre-arranged before the certification, received materially less complete information than it would have with full disclosure. Because the pre-arrangement fact was never disclosed throughout Plaintiff's purchase period, the misleading impression created by the uncorrected filing sequence remained operative throughout that period. The two-narrative framework in Paragraph 58 describes the price consequence of that ongoing omission.

## EXCLUSIVELY POSSESSED EVIDENCE

36. The following categories of evidence are within Defendants' exclusive possession and cannot be obtained without discovery:

(a) THE JP MORGAN BLOCK TRADE ENGAGEMENT MATERIALS: The engagement letter, instructions, communications, and timeline establishing when Cohen engaged JP Morgan for the block trade.

(b) THE JP MORGAN COMPLIANCE COMMUNICATIONS: All communications between Cohen and JP Morgan's compliance function regarding Cohen's MNPI status.

(c) THE COMPLETE COOPERATION AGREEMENT AND

PRE-CLEARANCE RECORDS: Including all trading restriction provisions and pre-clearance communications.

(d) THE BBBY BOARD MINUTES AND PRESENTATIONS (June 1 - August 16, 2022): Establishing what information was presented to board members -- including Cohen's three designated directors.

(e) ALL COMMUNICATIONS BETWEEN COHEN AND HIS DESIGNATED BOARD MEMBERS (June 1 - August 16, 2022).

## THE FIVE MNPI CATEGORIES

37. Cohen possessed material nonpublic information as of August 16, 2022 in five specifically identified categories:

38. CATEGORY A -- SUPPLIER PAYMENT FAILURES: Cohen possessed nonpublic information that BBBY had materially failed to make timely payments to key suppliers, who had consequently ceased or threatened to cease shipments. BBBY publicly disclosed this on August 19, 2022 (BBBY Press Release and SEC Filing dated August 19, 2022 -- Public Disclosure of Supplier Payment Failures and Emergency Vendor Negotiations (publicly available)) -- three days after Cohen's Form 144 certification. A supplier crisis requiring emergency disclosure within 72 hours does not arise overnight; it is an ongoing board-level condition that developed over weeks. Cohen's designated directors would reasonably have been briefed on vendor payment issues at board meetings preceding August 16, 2022.

39. CATEGORY B -- LIQUIDITY CRISIS AND ABL DETERIORATION: Cohen possessed nonpublic information that BBBY faced an imminent and severe liquidity crisis, including materially deteriorating conditions under its ABL facility with JP Morgan Chase Bank, N.A. BBBY's January 5, 2023 going-concern disclosure (approximately 30% price decline) and JP Morgan Chase's ABL acceleration on January 26, 2023 (approximately 22% price decline) prove the market was surprised by the severity. Both events occurred during Plaintiff's purchase period.

40. CATEGORY C -- BUYBUY BABY STRATEGIC FAILURE: Cohen possessed nonpublic information that the buybuy BABY spin-off or sale -- the strategic transaction that was the centerpiece of the Cooperation Agreement (Exhibit B) -- was not viable. BBBY announced this on February 7, 2023, producing an approximately 48% price decline. Cohen knew this strategic option was failing while certifying on the Form 144 that "he does not know any material adverse information" about BBBY.

41. CATEGORY D -- WORKFORCE REDUCTION AND STORE CLOSURE PROGRAM: Cohen possessed nonpublic information about an imminent massive restructuring. BBBY announced approximately 150 store closures and 20% workforce reduction on August 31, 2022 -- fifteen days after Cohen's Form 144 certification. A restructuring of this magnitude requires board-level deliberation weeks in advance.

42. CATEGORY E -- STRUCTURAL INFORMATION PIPELINE: The Cooperation Agreement created a documented mechanism by which Cohen received board-level information. Cohen's three designated directors attended board meetings in the weeks preceding August 16, 2022 at which Categories

A through D were discussed.

THE SCHEME:

FOUR INDEPENDENT ACTS OF DECEPTIVE CONDUCT

43. Count III rests on four acts of deceptive conduct that are analytically independent of any statement's truth or falsity. Under WPP Luxembourg Gamma Three Sarl v. Spot Runner, Inc., 655 F.3d 1039, 1057 (9th Cir. 2011), scheme liability must involve conduct "distinct from" the alleged misstatement. Under Lorenzo v. SEC, 587 U.S. 71 (2019), and In re Alphabet Inc. Sec. Litig., 1 F.4th 687 (9th Cir. 2021), scheme liability encompasses deceptive conduct operating independently of any statement. Each scheme act is pleaded with the particularity required by Federal Rule of Civil Procedure 9(b) and the PSLRA, specifying the who, what, when, where, and how of each act of deceptive conduct. See Vess v. Ciba-Geigy Corp. USA, 317 F.3d 1097, 1106 (9th Cir. 2003).

44. THE INDEPENDENCE TEST: Each act below satisfies the following test: if every public filing Cohen made were truthful -- if the 13D/A #2 had accurately stated "plans have changed" and the Form 144 had accurately disclosed Cohen's MNPI -- the act would still constitute independent deceptive conduct. This is the standard that separates genuine scheme liability from "Count I dressed as (a)/(c)."

45. SCHEME ACT ONE -- PRIVATE PRE-TRADE COMPLIANCE MISREPRESENTATIONS TO JP MORGAN: On information and belief,

FIRST AMENDED COMPLAINT

Cohen made private representations to JP Morgan Securities LLC's compliance function regarding his MNPI status in connection with the pre-trade compliance review JP Morgan was required to conduct before executing a $178 million block trade for a client with known board-observer access. These bilateral, non-public communications are entirely distinct from any public statement or regulatory filing. Even if every public filing Cohen made were accurate, false private representations to the executing broker's compliance function to obtain execution of a trade would constitute independently deceptive conduct. The specific content of these private compliance communications is "peculiarly within the opposing party's knowledge," justifying information-and-belief pleading under Ninth Circuit precedent. Arista Records, LLC v. Doe 3, 604 F.3d 110, 120 (2d Cir. 2010). The bases for this information-and-belief allegation are: (i) pre-trade compliance review is standard institutional practice under FINRA Rules 3110 (Supervision) and 3120 (Supervisory Control System), which require broker-dealers to establish supervisory procedures to prevent insider trading; (ii) the JP Morgan dual-client relationship (JP Morgan Securities LLC as Cohen's execution agent, JP Morgan Chase Bank, N.A. as BBBY's ABL lender under the credit facility referenced in BBBY's March 30, 2023 Form 8-K (SEC EDGAR Acc. No. 0001193125-23-084725)) created a heightened MNPI-screening obligation, because the same financial institution held material nonpublic information about BBBY's liquidity through its lending relationship; (iii) JP Morgan executed the $178 million block trade, which is inconsistent with Cohen having truthfully disclosed his actual MNPI status -- a broker-dealer aware that its client possessed board-level MNPI regarding imminent supplier defaults (Category A), ABL deterioration (Category B), and a failing strategic transaction (Category C) would not, under applicable FINRA supervisory obligations, have executed the trade without additional

safeguards or refusal; (iv) Cohen's Form 144 certification that "he does not know any material adverse information" (Exhibit D) was made contemporaneously with and in support of the same trade, suggesting that the private compliance representations mirrored the false public certification; and (v) the specific content of these bilateral compliance communications, including any written representations Cohen provided to JP Morgan's supervisory compliance function, is within Defendants' exclusive possession and control, and Plaintiff cannot plead the exact content without discovery. The strongest inferential basis is the completed execution itself: JP Morgan's compliance function cleared the trade, which would not have occurred had Cohen truthfully disclosed his board-level MNPI status. The inference that Cohen made false compliance representations is thus grounded in the regulatory framework governing every institutional block trade of this character.

46. SCHEME ACT TWO -- MNPI-INFORMED OPTION EXERCISE: On or about August 16-17, 2022, Cohen exercised approximately 2,350,000 call options on BBBY common stock as part of his coordinated liquidation while possessing board-level MNPI in Categories A through E. The option exercises were reported in Form 4 (SEC EDGAR Acc. No. 0000921895-22-002498) filed August 18, 2022 -- two business days after the exercise date, on the last permissible day, consistent with the deliberate sequencing alleged in Scheme Act Three. Exercising in-the-money options while possessing board-level knowledge of imminent corporate collapse is quintessential insider trading conduct. This is a trade execution, not a statement. Its deceptive character arises from converting inside knowledge into trading profit -- exploiting an informational asymmetry that counterparties cannot detect. United States v. O'Hagan, 521 U.S. 642, 653-55 (1997). Even if every public filing Cohen

made were accurate, exercising options while possessing undisclosed board-level knowledge of BBBY's path to insolvency would remain independently deceptive.

47. SCHEME ACT THREE -- DELIBERATE THREE-DOCUMENT REGULATORY SEQUENCING AS CONCEALMENT ARCHITECTURE: Cohen executed the 13D/A #2, the sale, and the 13D/A #3/Form 4 in a precise three-step sequence designed to make the pre-arranged liquidation appear spontaneous. The deliberate arrangement of the filing sequence to create a misleading chronological narrative is an act of concealment architecture distinct from the content of any individual filing. The 13D/A #2 was filed at 9:16 a.m. on August 16; execution commenced on August 16-17; the Form 4 (SEC EDGAR Accession No. 0000921895-22-002498) and 13D/A #3 (Exhibit F) were filed on August 18 -- the last permissible filing day. Even if every filing were accurate in isolation, engineering their sequence to manufacture the appearance of spontaneity -- to make a pre-arranged exit look like a sudden decision -- would be independently deceptive. The concealment inheres in the architecture, not the content.

47A. SCHEME ACT FOUR -- THE DENOMINATOR MANIPULATION AS DECEPTIVE MARKET CONDUCT: On August 16, 2022, Cohen filed Amendment No. 2 (Exhibit E) reporting his beneficial ownership of BBBY at approximately 9.8%, using a stale share-count denominator. His actual beneficial ownership was approximately 11.8% -- above the Section 16(b) disgorgement threshold. The deliberate selection of a stale denominator that placed reported ownership at 9.8% -- precisely below the Section 16(b) threshold, not at any other figure -- is an independent act of deceptive market conduct distinct from any filing's textual accuracy. The deception inheres in

the strategic act of manipulating the reported ownership percentage to fall just below the Section 16(b) threshold, thereby (a) concealing the legal significance of Cohen's actual above-10% position from market participants who rely on disclosed ownership percentages, and (b) preventing the market from incorporating the constraint signal that accurate 10%+ disclosure would have communicated. Even if every other filing Cohen made were accurate in isolation, the deliberate use of a stale denominator to place reported ownership just below a legally significant threshold -- while selling his entire actual above-10% position into the market confidence generated by the unamended Item 4 contingency representation and the artificially suppressed ownership disclosure -- constitutes independently deceptive conduct within the meaning of Rule 10b-5(a) and (c). This scheme act satisfies the WPP Luxembourg independence test established in Paragraph 44: it would be deceptive even if the text of every filing were independently accurate.

48. Each of these four acts is independent of the 13D/A #2 misstatement and the Count II omission. Each would be deceptive even if Cohen had filed an accurate 13D/A #2 stating "plans have changed." The JP Morgan compliance representations were private bilateral communications in a non-public channel. The MNPI-informed option exercise was pure transactional conduct. The regulatory sequencing was a structural choice about order and timing, not filing content. Count III adds independent conduct-based liability, not repackaged statement-based liability.

49. The scheme operated from no later than early August 2022 through at least April 23, 2023. Each scheme act continued to affect market prices throughout Plaintiff's purchase period because the concealment was never pierced.

SCIENTER

50. Cohen acted with scienter -- knowingly or with deliberate recklessness as to the falsity of his representations. Under the Ninth Circuit's standard, deliberate recklessness is "a highly unreasonable omission, involving not merely simple, or even inexcusable negligence, but an extreme departure from the standards of ordinary care." In re Daou Sys., Inc., 411 F.3d 1006, 1015 (9th Cir. 2005). Scienter may be established through circumstantial evidence, provided the allegations, taken collectively, give rise to a strong inference of fraudulent intent. Zucco Partners, LLC v. Digimarc Corp., 552 F.3d 981, 991-92 (9th Cir. 2009).

51. THE DOCUMENTARY CONTRADICTION: Cohen signed two documents creating a factual contradiction that is difficult to reconcile. The Cooperation Agreement (Exhibit B) "acknowledged that Cohen would receive material, nonpublic information." D.D.C. Opinion at 16. The Form 144 (Exhibit D) certified that "he does not know any material adverse information in regard to the current and prospective operations of the Issuer of the securities to be sold which has not been publicly disclosed." These documents were executed by the same person with respect to the same company during the same period of board access.

52. The Cooperation Agreement (Exhibit B) and the Form 144 certification (Exhibit D) are facially irreconcilable. The Cooperation Agreement was executed on March 6, 2022, establishing an express information pipeline to Cohen through three designated board directors. By August 16, 2022 -- more than five months into active board participation -- that pipeline had been

FIRST AMENDED COMPLAINT

operational through multiple board meetings at which the categories of material nonpublic information described in Paragraphs 38-42 were the subject of board deliberation -- as evidenced by the public disclosures that followed in rapid succession (Paragraphs 38-42). The D.D.C. court treated the Agreement as establishing actual MNPI access, not merely potential or future access. D.D.C. Opinion at 16. That same court found the Form 144 certification was "itself misleading" and that Cohen "just barely beat this bad news, which suggests he saw it coming." D.D.C. Opinion at 15. Five months of board participation through three designated directors, combined with the temporal proximity between the certification and the subsequent public disclosure of each MNPI category, gives rise to a strong inference that information had flowed to Cohen through the pipeline the Agreement created. Cohen's Form 144 certification that "he does not know any material adverse information" about BBBY "that has not been publicly disclosed" was, on these facts, irreconcilable with an active information pipeline expressly designed to channel exactly such information to him through his three designated directors. The categorical nature of the Form 144 denial -- "no" adverse information, with no qualification or exception -- is in acute tension with five months of operation of an information conduit the Cooperation Agreement itself created for precisely that purpose.

53. THE COMPETING INNOCENT INFERENCE FAILS UNDER TELLABS: Under Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 314 (2007), the competing inference must be "cogent and compelling." The innocent inference requires accepting simultaneously:

(a) Cohen had no plans to sell at 9:16 a.m. and spontaneously decided to liquidate $178 million afterward -- implausible under standard institutional

practice as documented in the structural implausibility analysis in Paragraph 29(a), and Charts 1 and 2 (set forth in Paragraph 2) documenting the institutional compliance sequence and the sequential bookbuilding steps required under upstairs market practice, which set forth the applicable FINRA and SEC authority, supporting a strong inference that any legitimate $178 million block trade of this character would not, under standard institutional practice, have been arranged overnight.

(b) Cohen's three designated board directors attended meetings where supplier payment failures (Category A, publicly disclosed August 19, 2022), pending store closures and workforce reductions (Category D, announced August 31, 2022), and the other MNPI categories identified in Paragraphs 38-42 were discussed, yet Cohen certified "he does not know" any material adverse information -- irrational given the Agreement's express purpose of channeling such information to Cohen.

(c) Cohen precisely orchestrated a three-document regulatory sequence -- filing Form 4 (SEC EDGAR Accession No. 0000921895-22-002498) on the last permissible day -- yet was unaware he had plans to sell when he filed Amendment No. 2 -- self-contradictory.

(d) Cohen, who witnessed his social media posts move markets during the GameStop episode, posted a bullish BBBY signal on August 12 while simultaneously arranging to liquidate 100% of his position -- in strong tension with any version of the innocent timeline.

54. ADDITIONAL SCIENTER CATEGORIES:

(a) PRIOR FEDERAL REGULATORY ENFORCEMENT ACTION -- PATTERN EVIDENCE OF SCIENTER: The Department of Justice obtained a civil judgment against Cohen with a $985,320 penalty for claiming the "investment-only" HSR exemption while simultaneously conducting board activism -- a separate federal enforcement action that is probative of a pattern of making false regulatory representations to federal authorities to obscure the true nature of his investment activities. United States v. Cohen, No. 1:24-cv-02670 (D.D.C.) (a separate federal regulatory enforcement action (publicly available on PACER and at justice.gov)). That enforcement action and this case share the same structural methodology: Cohen certified one investment purpose to regulators while pursuing a materially different and undisclosed strategy. This is a separate federal regulatory enforcement action resulting in a civil penalty, entered by consent without trial or adjudication and without constituting evidence against or an admission by the defendant; it is offered as pattern evidence of scienter, not as proof of the conduct alleged herein. Courts have recognized that false Schedule 13D representations constitute serious securities fraud. See United States v. Bilzerian, 926 F.2d 1285 (2d Cir. 1991) (criminal conviction affirmed for filing false Schedule 13D statements misrepresenting the source and purpose of stock purchases; disgorgement exceeding $33 million ordered).

(b) TEMPORAL PROXIMITY: Category A disclosed 3 days post-Form 144 certification; Category D announced 15 days post-Form 144 certification; Category B confirmed by January 5, 2023 going-concern warning; Category C announced February 7, 2023. The market was surprised by each, proving the information was material and nonpublic.

(c) TRADING RESTRICTION COMPLIANCE GAP: The Cooperation

FIRST AMENDED COMPLAINT

Agreement (Exhibit B, §1(d)) expressly required Cohen's directors to "strictly adhere to the policies on confidentiality, insider trading and conflicts of interest imposed on all members of the Board." BBBY's own Fourth Amendment to its Credit Agreement (BBBY Form 8-K filed March 30, 2023, SEC EDGAR Acc. No. 0001193125-23-084725, EX-10.1 at p.138) confirmed by public SEC filing the existence of "blackout period[s] established pursuant to the Company's insider trading policy." Cohen's August 16 liquidation -- executed while possessing the five MNPI categories identified in Paragraphs 38-42 -- is in tension with these contractual and corporate trading restrictions.

(d) COMPLETE LIQUIDATION WITH PRECISION TIMING: Cohen liquidated 100% of holdings 3 days before the first public bad news, capturing pre-disclosure prices of $18-$29 per share.

(e) DENOMINATOR MANIPULATION AS CIRCUMSTANTIAL SCIENTER EVIDENCE (NOT A DIRECT INJURY CLAIM): Amendment No. 2 (Exhibit E) reported Cohen's beneficial ownership of BBBY at approximately 9.8% -- a figure derived by using a stale November 2021 outstanding-share-count denominator rather than the then-current denominator. Cohen's actual beneficial ownership at the time of Amendment No. 2, calculated using current outstanding share counts, was approximately 11.8% -- above the Section 16(b) disgorgement threshold. As alleged in Paragraph 26A and Paragraph 47A, the deliberate use of a stale denominator placed the reported percentage precisely below the 10% threshold, concealing Cohen's above-10% status. The precision of this selection -- not 9.0%, not 9.5%, but 9.8%, at the margin of the legally significant threshold -- is circumstantial evidence that Cohen understood the threshold's significance and deliberately managed his reported ownership number to fall just below it. That 9.8% reported figure, filed at 9:16 a.m. on the morning of Cohen's complete

liquidation, also functioned in the market as a signal of continued investment commitment -- market participants tracking ownership filings would have understood an above-10% position as evidence of long-term investment posture, a signal Cohen suppressed by reporting below 10% through denominator manipulation. This pattern -- actual above-10% ownership, reported below-10% ownership through stale denominator, complete liquidation of the entire position, timed at 9:16 a.m. on the morning of the block trade -- is consistent with an investor who understood his Section 16(b) obligations, the market perception consequences of above-10% disclosure, and the legal significance of the 10% threshold. Plaintiff does NOT claim damages arising from the denominator manipulation itself, and this scienter element does NOT establish direct injury during Plaintiff's January 19 to April 19, 2023 purchase period. It is offered as circumstantial evidence of Cohen's sophisticated understanding of market mechanics and regulatory disclosure obligations -- precisely the understanding required to knowingly manage the filing sequence in the manner alleged.

54A. TELLABS HOLISTIC ASSESSMENT: Viewed collectively, as Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 326 (2007), requires -- and as the Ninth Circuit applies that standard, South Ferry LP, No. 2 v. Killinger, 542 F.3d 776, 784 (9th Cir. 2008) -- the foregoing scienter categories -- (a) the documentary contradiction between the Cooperation Agreement's MNPI acknowledgment and the Form 144's categorical denial (¶¶51-52); (b) the D.D.C. court's independent finding that the Form 144 was "itself misleading" and that Cohen "just barely beat this bad news" (D.D.C. Opinion at 15); (c) the competing innocent inference's implausibility under standard institutional practice (¶53); (d) the prior HSR penalty establishing a pattern of false regulatory certifications (¶54(a)); (e) the temporal proximity of each MNPI category's public disclosure to the certification date (¶54(b)); (f) the trading

restriction compliance gap (¶54(c)); (g) the 100% liquidation at pre-disclosure prices of $18-$29 per share (¶54(d)); and (h) the denominator manipulation placing reported ownership precisely below the Section 16(b) threshold (¶54(e)) -- give rise to a strong inference of scienter that is "cogent and at least as compelling as any opposing inference of nonfraudulent intent." Tellabs, 551 U.S. at

314. The best innocent explanation -- that Cohen spontaneously arranged a $178 million institutional block trade overnight, that his three designated board directors reported nothing to him despite five months of active participation, and that he coincidentally selected a stale denominator producing a reported ownership percentage precisely below the legally significant threshold -- requires accepting multiple implausible propositions simultaneously. The inference of knowing or deliberately reckless concealment is not merely as compelling; it is substantially more compelling than any innocent alternative. See In re NVIDIA Corp. Sec. Litig., 768 F.3d 1046, 1053-54 (9th Cir. 2014) (scienter inference must be assessed holistically; individual facts "may not be so damning in isolation, but together they create a strong inference"); Berson v. Applied Signal Tech., Inc., 527 F.3d 982, 987 (9th Cir. 2008) (same).

RELIANCE

55. COUNT I RELIANCE -- FRAUD-ON-THE-MARKET (PRICE MAINTENANCE): Under Basic Inc. v. Levinson, 485 U.S. 224, 241-47 (1988), and Halliburton Co. v. Erica P. John Fund, Inc., 573 U.S. 258, 268 (2014), the fraud-on-the-market presumption applies because: (a) BBBY traded in an efficient market (Paragraph 18); (b) Cohen's 13D/A #2 filing was a public misstatement in connection with a securities transaction; (c) the

FIRST AMENDED COMPLAINT

misstatement was material; and (d) Plaintiff traded BBBY during the period the misstatement remained uncorrected. Critically, Plaintiff's purchase period (January 19 through April 19, 2023) occurred months after the August 2022 "meme stock" volatility had subsided. By January 2023, BBBY's trading patterns had normalized: the stock responded to fundamental corporate disclosures (the January 26 10-Q, the February 7-8 buybuy BABY announcement, the March-April equity offerings) in predictable directional moves consistent with semi-strong market efficiency. Any contention that BBBY's market was inefficient during the August 2022 meme frenzy is inapposite to the January-April 2023 purchase period at issue here.

56. The misstatement was never fully corrected. As established in Paragraphs 5-7, the August 18 disclosure revealed that Cohen sold. It did not reveal the pre-arrangement, the MNPI categories, or the falsity of the certification. The fraud premium (Paragraphs 14-17) persisted throughout Plaintiff's purchase period because the market had not received the information necessary for full correction. As established in Paragraph 58, the filing sequence conveyed a composite misrepresentation that embedded a fraud premium in BBBY's market prices during Plaintiff's purchase period.

57. COUNT II RELIANCE -- AFFILIATED UTE: The Affiliated Ute Citizens of Utah v. United States, 406 U.S. 128 (1972), presumption of reliance applies to Count II because, as established in Paragraphs 34-35, the claim is primarily based on an omission. While the half-truth theory requires an affirmative statement as the trigger for the duty to speak completely, the actionable wrong remains the omitted pre-arrangement fact -- what Cohen failed to disclose, not whether what he said was false. A plaintiff cannot be expected to demonstrate reliance on information that was never disclosed; the Affiliated Ute

presumption exists precisely for this circumstance. The temporal gap between the Form 144 certification (Exhibit D) and Plaintiff's purchases does not defeat the presumption. The five categories of MNPI (Paragraphs 38-42) and the pre-arrangement fact remained continuously undisclosed throughout Plaintiff's entire purchase period: Cohen never corrected or retracted the Form 144 certification in which he swore "he does not know any material adverse information," never disclosed the JP Morgan arrangement to the market, and never filed any curative statement. The omission was not a discrete historical event but an ongoing, uninterrupted condition that persisted throughout every transaction at issue. Affiliated Ute reliance is therefore presumed for each purchase during the relevant period.

58. SUPPORTING -- COMPOSITE NARRATIVE DIRECT RELIANCE: The August 2022 disclosure package conveyed a composite false narrative: a sophisticated activist investor held BBBY through August 16, 2022, had left operative on EDGAR the original Schedule 13D's (Exhibit A) Item 4 contingency representation -- which he never amended to disclose the material change in his plans even as he pre-arranged a complete liquidation -- and then sold his entire position -- a sequence that reads, at most, as a reactive exit following receipt of new information after the Amendment No. 2 filing. That false narrative embedded in the filing sequence told the market: this is a security retaining residual value and optionality; even BBBY's most committed activist eventually exited, but he signed the Form 144 certification (Exhibit D) swearing no adverse knowledge before doing so. As established in the Structural Implausibility Analysis, that narrative was architecturally false: the standard institutional compliance sequence for a $178 million prime brokerage block trade -- which, on information and belief, under applicable FINRA and prime brokerage practice would have required issuer

FIRST AMENDED COMPLAINT

pre-clearance, MNPI supervisory review, credit and risk approval, regulatory filing coordination, and written mandate -- would, under standard institutional practice, have been underway before 9:16 a.m. on August 16, giving rise to a strong inference that the arrangement predated the Amendment No. 2 filing. The undisclosed facts, as alleged, support a materially different inference: Cohen, through his three designated board directors, received adverse MNPI indicating that BBBY would become worthless absent immediate action; pre-arranged a $178 million institutional liquidation before Amendment No. 2 was filed; and executed the pre-arranged sale the same morning he filed Amendment No. 2, leaving the Item 4 Representation unamended. That sequence supports a strong inference of a pre-planned exit on concealed adverse information, and is difficult to reconcile with any version of the innocent reactive timeline defendants have advanced. An investor who understood the true story would not have purchased BBBY securities at any price premised on the company-viability narrative, because disclosure of the true facts would have materially reduced the perceived residual value and optionality of the BBBY position that market participants were pricing into the securities during the relevant period. The accelerated-bankruptcy consequence confirms the premium: BBBY raised survival capital through equity offerings during Plaintiff's purchase period (BBBY Form 8-K filed March 8, 2023 (SEC EDGAR Acc. No. 0001193125-23-063828); BBBY Form 8-K filed March 30, 2023 (SEC EDGAR Acc. No. 0001193125-23-084725); BBBY Form S-1 filed April 11, 2023 (SEC EDGAR Acc. No. 0001193125-23-097982)) at prices inflated by the misrepresentation -- capital that the company could not have attracted at truthful prices reflecting a pre-arranged insider exit on concealed catastrophic information, and whose attraction at false prices delayed rather than prevented the insolvency outcome while the concealment persisted. The stepwise

correction map in Paragraph 7 (incorporated herein) quantifies the premium: ten market-relevant events on or after January 5, 2023 through April 11, 2023 (the last corrective disclosure before the end of Plaintiff's purchase period), comprising eight corrective DOWN events and two price-sustaining UP events, confirm that the market was continuously receiving previously undisclosed information throughout Plaintiff's purchase period. The gap between the Item 4 Representation, left operative by the August 16 filing sequence, and the true-story price is the fraud premium Plaintiff paid. This narrative was never officially retracted and was actively defended by Cohen in federal court on March 15, 2023. Plaintiff's Amended Declaration (Exhibit I) establishes the causal role of this misrepresentation in his purchasing decisions.

## LOSS CAUSATION

59. Plaintiff's losses were caused by Defendants' fraud through three independently sufficient causal tracks. Track One (First Solar -- Materialization of Concealed Risk) applies to the April 23, 2023 bankruptcy: the terminal materialization of the specific operational and financial risks Cohen concealed through the five MNPI categories. Track Two (Loos/BofI -- Revelation of Concealed Information) applies to each corrective disclosure that revealed the content of a specific MNPI category during Plaintiff's purchase period. Track Three (Dura -- Inflation at Purchase) applies to each of Plaintiff's purchases: each was executed at a price artificially inflated by the fraud premium established in Paragraphs 14-17, which persisted because the pre-arrangement and five MNPI categories were never disclosed. The three tracks are independently sufficient to establish loss causation; together they

address the full range of purchase-date-specific causal connections between the fraud and Plaintiff's losses.

60. TRACK ONE -- FIRST SOLAR MATERIALIZATION OF CONCEALED RISK: Under Mineworkers' Pension Scheme v. First Solar Inc., 881 F.3d 750, 753-54 (9th Cir. 2018), loss causation is established when the loss falls within the "zone of risk" the fraud concealed. The fraud concealed five specific operational and financial risks: supplier payment failures (Category A), ABL facility deterioration leading to acceleration and eventual default (Category B), buybuy BABY strategic nonviability (Category C), imminent store closure and workforce reduction (Category D), and the structural information pipeline confirming Cohen's board-level access to each of these risks (Category E). BBBY's April 23, 2023 Chapter 11 bankruptcy filing is the terminal materialization of those concealed risks.

61. First Solar does not require that the defendant caused the operational failure. It requires that the defendant concealed the risk that materialized. 881 F.3d at 753-54. Cohen concealed five categories of specific operational and financial information as set forth in Paragraphs 38-42. Those five categories collectively described a path to insolvency whose terminus was the April 23, 2023 bankruptcy. The causal nexus is direct. The concealed risks are the same risks that materialized. Plaintiff purchased within the period the concealment maintained the fraud premium. And the ultimate loss falls within the zone of risk the fraud created.

62. PURCHASE-DATE-SPECIFIC CAUSATION -- TRACK ASSIGNMENTS:

(a) JANUARY 19, 2023 (first purchases) -- TRACK THREE (Dura): At the time

FIRST AMENDED COMPLAINT

of Plaintiff's first purchases, the pre-arrangement remained undisclosed and all five MNPI categories remained undisclosed. The market price reflected known distress but not the fraud quality of Cohen's exit or the specific MNPI content. Each purchase on this date was executed at a price containing the fraud premium -- the spread between the actual market price and the price that would have prevailed had the pre-arrangement and MNPI been disclosed. (SEC EDGAR Schedule 13D/A filings (Exhibits A-F) (publicly available); Plaintiff's Amended Declaration (Exhibit I) and brokerage trading records (Exhibit J).)

(b) JANUARY 26, 2023 (ABL default disclosed in 10-Q) -- TRACK TWO (Loos/BofI): BBBY disclosed the ABL default in its 10-Q filing (SEC EDGAR Acc. No. 0000886158-23-000026), revealing Category B MNPI (ABL deterioration and liquidity crisis) that Cohen had possessed and concealed at the time of his Form 144 certification. This disclosure simultaneously proved the Form 144 certification was false as to Category B: the "material adverse information" Cohen denied possessing was the very information now entering the market. The approximately 22% price decline on this date proves the market was receiving new information it had not previously priced. Plaintiff's purchases preceding January 26 suffered a material adverse price reaction when the market received Category B information Cohen had possessed and concealed.

(c) FEBRUARY 7-8, 2023 (buybuy BABY abandonment) -- TRACK TWO (Loos/BofI): BBBY's Form 8-K filed February 7, 2023 (SEC EDGAR Acc. No. 0001193125-23-027117) announced that the buybuy BABY strategic transaction -- the centerpiece of the Cooperation Agreement (Exhibit B) -- was not viable, revealing Category C MNPI. This disclosure simultaneously proved the Form 144 certification was false as to Category C: the strategic alternative Cohen had promoted through the Cooperation Agreement was failing, and that failure

constituted "material adverse information" Cohen denied possessing. The approximately 48% price decline over February 7-8 proves the market was surprised by information that had been concealed. Plaintiff's purchases preceding February 7 suffered a material adverse price reaction when the market received Category C information Cohen had possessed and concealed.

(d) APRIL 19-23, 2023 (final purchases and bankruptcy) -- TRACKS ONE AND TWO (First Solar and Loos/BofI): BBBY's Chapter 11 filing on April 23, 2023 (SEC EDGAR Form 8-K filed April 24, 2023, Acc. No. 0001193125-23-111754) -- four days after Plaintiff's last purchase on April 19 -- is the terminal materialization of all five concealed MNPI categories (Track One). The bankruptcy confirmed that every category of "material adverse information" Cohen denied possessing -- supplier failures, liquidity collapse, buybuy BABY failure, store closures, and the pre-arranged liquidation itself -- had been real and concealed. It also constitutes the final corrective disclosure revealing the concealed information in its entirety (Track Two). Plaintiff's final purchases on April 19 were made while the fraud premium remained intact and the pre-arrangement remained undisclosed. (SEC EDGAR Schedule 13D/A filings (Exhibits A-F) (publicly available); BBBY Form 8-K filed March 8, 2023 (SEC EDGAR Acc. No. 0001193125-23-063828); BBBY Form 8-K filed March 30, 2023 (SEC EDGAR Acc. No. 0001193125-23-084725); BBBY Form S-1 filed April 11, 2023 (SEC EDGAR Acc. No. 0001193125-23-097982).)

63. TRACK TWO -- REVELATION OF CONCEALED INFORMATION (Loos/BofI): Under Loos v. Immersion Corp., 762 F.3d 880 (9th Cir. 2014), and In re BofI Federal Bank Sec. Litig., 977 F.3d 781 (9th Cir. 2020), loss causation is established when a corrective disclosure reveals information that the fraud had concealed, producing an adverse price reaction. The corrective

FIRST AMENDED COMPLAINT

disclosures in Para 62(b) and (c) each revealed the content of a specific MNPI category Cohen had possessed and concealed: the January 26 ABL default disclosure (10-Q) revealed Category B; the February 7-8 buybuy BABY abandonment revealed Category C; and the April 23, 2023 bankruptcy constituted the final revelation of Categories A through E collectively. Each adverse price reaction on a corrective disclosure date is the direct measure of the fraud premium that event removed from BBBY's market price (see Exhibit G, BBBY Public Disclosures and Stock-Price Chronology, for the complete chronological record of each price decline).

64. TRACK THREE -- INFLATED PURCHASE PRICE (Dura): Under Dura Pharmaceuticals, Inc. v. Broudo, 544 U.S. 336, 342-43 (2005), loss causation is established when a plaintiff purchases at a price inflated by fraud and subsequently suffers a loss when that inflation is removed through corrective disclosure or materialization of concealed risk. Each of Plaintiff's purchases between January 19 and April 19, 2023 was executed at a price incorporating the fraud premium established in Paragraphs 14-17. Track Three applies to all purchases: each was inflated at the time of purchase; the inflation was removed through the corrective disclosures identified in Para 62 and, ultimately, through the April 23 bankruptcy, as corroborated by Exhibit G, BBBY Public Disclosures and Stock-Price Chronology, which documents each market price decline corresponding to each corrective event during Plaintiff's purchase period.

65. BBBY'S BANKRUPTCY IS NOT A SUPERSEDING CAUSE:

(a) FORESEEABILITY: Under Lloyd v. CVB Financial Corp., 811 F.3d 1200, 1210 (9th Cir. 2016), a superseding cause must be unforeseeable. BBBY's

bankruptcy was the specific event Cohen anticipated, acted upon, and concealed. A defendant who foresees and acts upon an event cannot invoke it as superseding.

(b) NON-INDEPENDENCE: Cohen's fraud contributed to the conditions under which BBBY raised survival capital at fraud-inflated prices. BBBY raised survival capital through equity offerings during Plaintiff's purchase period at prices reflecting the incomplete information set Cohen's fraud maintained (see BBBY Form 8-K filed March 8, 2023 (SEC EDGAR Acc. No. 0001193125-23-063828); BBBY Form 8-K filed March 30, 2023 (SEC EDGAR Acc. No. 0001193125-23-084725); BBBY Form S-1 filed April 11, 2023 (SEC EDGAR Acc. No. 0001193125-23-097982)).

(c) DOCTRINAL PURPOSE: Section 10(b)'s purpose would be undermined if an insider could know bankruptcy is imminent, certify no such knowledge, liquidate everything, and invoke the anticipated event as superseding cause.

(d) CONTINUOUS NON-DISCLOSURE: The filing sequence was never corrected through Plaintiff's entire purchase period. Cohen filed no curative amendment to his Schedule 13D/A. He made no public correction of the Item 4 Representation and never disclosed the pre-arrangement to the market.

Because the Item 4 representation remained uncorrected on EDGAR, the fraud premium persisted throughout Plaintiff's purchase period. The fraud-inflated market price also enabled BBBY to raise survival capital through the three equity offerings identified in subparagraph (b) above -- each priced on incomplete information. BBBY's subsequent bankruptcy was therefore not a superseding cause: it was the terminal consequence of the same concealed risks

Cohen exploited and failed to disclose.

DAMAGES

66. Plaintiff does not seek recovery of losses caused by BBBY's operational failure independent of the fraud. Plaintiff seeks only the fraud-related inflation component: the specific premium paid above the price that would have prevailed had the pre-arrangement and MNPI been disclosed. Plaintiff's total losses were approximately $23,400. The fraud-related inflation component -- a subset of total losses -- is determinable through event study methodology isolating the price impact of each corrective disclosure from confounding market factors.

STATUTE OF LIMITATIONS

67. This action was timely filed. Under 28 U.S.C. Section 1658(b), the two-year limitations period for Section 10(b) claims runs from when the plaintiff actually discovered, or with reasonable diligence would have discovered, the "facts constituting the violation." Merck & Co.

v. Reynolds, 559 U.S. 633, 648-49 (2010).

68. MERCK CHRONOLOGY:

Jan 30, 2023: Private plaintiffs file Second Amended Complaint in In re Bed Bath & Beyond Corp. Sec. Litig., No. 1:22-cv-02541-TNM (D.D.C.), alleging

Cohen engaged in fraud. These are contested private litigation allegations, not established facts. Cohen denies them.

Mar 15, 2023: Cohen files motion to dismiss in D.D.C., affirmatively asserting his Form 144 certification was accurate. A reasonably diligent investor confronting this record would find a live factual dispute -- not established facts constituting a violation.

Jul 27, 2023: D.D.C. court issues judicial findings that Cohen's Form 144 was "itself misleading" and that Cohen had "acknowledged" MNPI access. This is the first date on which "facts constituting the violation" -- as opposed to contested allegations -- became available.

2024: This action filed. Within two years of July 27, 2023.

69. Merck distinguishes between "information suggesting a violation may have occurred" and "facts constituting the violation." 559 U.S. at 648-49. Only the latter starts the clock. The D.D.C. class action complaint created the former: contested private allegations Cohen was actively disputing. The D.D.C. Opinion established the latter: judicial findings of a misleading Form 144 certification and MNPI access.

70. INDEPENDENT ACCRUAL FOR PRE-ARRANGEMENT THEORY: The central pre-arrangement theory is distinct from anything in the D.D.C. private class-action complaint. The institutional mechanics demonstrating that overnight arrangement is generally inconsistent with standard sequential wall-crossing and bookbuilding practice are not accessible to a retail investor without specialized knowledge. Inquiry notice did not attach for this theory

before July 27, 2023.

71. The five-year statute of repose under 28 U.S.C. Section 1658(b)(2) runs from the date of the last alleged fraudulent act. The last alleged act is Cohen's August 16-17, 2022 block-trade sale. Five years from that date is August 2027. The repose period has not expired.

## PSLRA SAFE HARBOR

72. The PSLRA safe harbor does not protect the 13D/A #2:

(a) The Item 4 Representation -- "No Reporting Person has any present plan or proposal which would relate to or result in any of the matters set forth in subparagraphs (a)-(j) of Item 4 of Schedule 13D except as set forth herein" -- filed March 7, 2022 and left unamended through Cohen's complete liquidation, is a representation of present fact, not a forward-looking statement. Metzler Inv. GMBH v. Corinthian Colleges, Inc., 540 F.3d 1049, 1070 (9th Cir. 2008).

(b) Even if the safe harbor applied, it provides no protection for statements made with actual knowledge of falsity. 15 U.S.C. Section 78u-5(c)(1)(B). The Form 144's denial of MNPI knowledge (Exhibit D) was equally made with actual knowledge of falsity. The safe harbor provides no protection for either.

(c) Section 13(d) mandatory disclosure obligations are regulatory compliance filings, not forward-looking statements.

COUNTS FOR RELIEF

COUNT I: VIOLATION OF SECTION 10(b) OF THE EXCHANGE ACT AND RULE 10b-5(b) -- SECTION 13(d)(2) MATERIAL CHANGE -- UNDISCLOSED CRYSTALLIZATION FROM GENERIC CONTINGENCY TO SPECIFIC PRESENT PLAN (Against All Defendants; Cohen Individually as Janus Maker)

73. Plaintiff incorporates by reference all preceding paragraphs.

74. The original Schedule 13D (Exhibit A) contained an affirmative statement in Item 4: "No Reporting Person has any present plan or proposal which would relate to or result in any of the matters set forth in subparagraphs (a)-(j) of Item 4 of Schedule 13D except as set forth herein" -- with "herein" referring to generic conditional possibilities of future transactions depending on market conditions. That affirmative contingency representation became a material half-truth within the meaning of Section 10(b) and Rule 10b-5(b) when Cohen's plans crystallized from those disclosed generic contingencies into a specific, pre-arranged, $178 million institutional block trade through JP Morgan Securities LLC, and Cohen failed to amend that operative statement as required by 17 C.F.R. § 240.13d-2(a). As the Second Circuit established in GAF Corp. v. Milstein, 453 F.2d 709, 720 (2d Cir. 1971), Section 13(d) filings must be truthful, and "a false filing may be more detrimental to the informed operation of the securities markets than no filing at all"; the obligation to amend arises whenever "any material change occurs in the facts set forth." Cohen filed Amendment No. 2 (Exhibit E) on August 16, 2022,

at 9:16 a.m., amending only Item 5 and leaving the Item 4 affirmative statement operative on EDGAR without correcting it. That operative Item 4 affirmative statement -- combined with the silence of Amendment No. 2 on Item 4 -- left the market with the impression that Cohen's plans remained as previously described: generic contingencies, no specific present plan -- at the precise moment when a $178 million pre-arranged exit was already underway. Defendants thus violated Section 10(b) of the Exchange Act and Rule 10b-5(b) by maintaining an affirmative statement that had become materially false and misleading by virtue of the undisclosed material change in plans.

The Structural Implausibility Analysis establishes that a $178 million prime brokerage block trade requires sequential compliance and bookbuilding steps inconsistent with overnight arrangement. That analysis supports a strong inference that the JP Morgan engagement preceded the 9:16 a.m. filing.

The undisclosed material change is the operative misrepresentation for Count I, as described in Paragraph 58. Its significance is confirmed by ten market events between January 5 and April 11, 2023, mapped in Paragraph 7 -- including eight corrective DOWN events, each revealing a category of information the material change had concealed.

75. As set forth in Paragraph 27, Count I pleads primary liability under two alternative Janus theories: (a) Ryan Cohen as the Janus maker with ultimate authority over the Item 4 filing's content; and

(b) RC Ventures LLC as the entity that placed the false and misleading filing into the market. These theories are pleaded in the alternative under Federal Rule of Civil Procedure 8(d)(2). Plaintiff does not contend that both Cohen and RC

Ventures independently made the same statement within the meaning of Janus. Count IV provides the further alternative of control-person liability against Cohen individually, and is operative only if the Court finds that neither primary-maker theory succeeds.

76. The statement was made under Cohen's mandatory Section 13(d) disclosure obligation and was "in connection with" the purchase and sale of BBBY securities. SEC v. Zandford, 535 U.S. 813, 820 (2002).

77. Defendants acted with scienter as established in Paragraphs 50-54. That showing is corroborated by the D.D.C. court's independent finding that the Form 144 certification was "itself misleading" and that Cohen "just barely beat this bad news, which suggests he saw it coming" (D.D.C. Opinion at 15).

Scienter is further demonstrated by the structural implausibility analysis in Paragraph 29(a), and Charts 1 and 2 (set forth in Paragraph 2), which establish that a $178 million institutional block trade requires sequential compliance steps -- issuer pre-clearance, MNPI supervisory review, risk approval, regulatory filing coordination, and written mandate -- each generating documented records. Those sequential steps give rise to a strong inference that Cohen was aware of the pre-arrangement when he filed Amendment No. 2 (Exhibit E) without amending Item 4.

Taken together, the sequential steps and generated records are highly inconsistent with any innocent explanation premised on inadvertence or ignorance. They give rise to a strong inference that Cohen knowingly failed to disclose the material change -- or acted with reckless disregard of the disclosure obligation -- when he filed Amendment No. 2 at 9:16 a.m. on August 16, 2022,

without any amendment to Item 4.

78. Plaintiff relied on the misstatement through the fraud-on-the-market price-maintenance presumption (Paragraphs 55-56) and composite narrative direct reliance (Paragraph 58).

79. Defendants' misstatement caused Plaintiff's losses through the three tracks described in Paragraphs 59-65.

80. Plaintiff seeks the fraud-related inflation component of his approximately $23,400 in total losses, plus pre- and post-judgment interest.

COUNT II: VIOLATION OF SECTION 10(b) OF THE EXCHANGE ACT

AND RULE 10b-5(b) -- FORM 144 CERTIFICATION HALF-TRUTH (Against All Defendants)

81. Plaintiff incorporates by reference Paragraphs 1-25, 29(a), 30-42, and 50-71. Count II is pleaded as an independent alternative theory under Federal Rule of Civil Procedure 8(d)(2) and survives even if Count I is dismissed. Count II advances a distinct legal theory: that Cohen's Form 144 certification (Exhibit D) -- in which he swore "he does not know any material adverse information" about BBBY -- was an affirmative statement rendered materially misleading by the omission of five categories of MNPI he possessed at the time of sale. The Form 144 certification is the sole affirmative statement vehicle for Count II. The Item 4/13D failure-to-amend theory is separately pleaded in Count I. Count II does not depend on Count I's failure-to-amend theory for liability, but

FIRST AMENDED COMPLAINT

references the unamended Item 4 representation as contextual evidence of materiality and the scope of the omission.

82. A half-truth -- a statement that is literally true but misleading by reason of what it omits -- is actionable under Rule 10b-5(b). The Supreme Court reaffirmed this principle in Macquarie Infrastructure Corp. v. Moab Partners, L.P., 601 U.S. 257, 263 (2024), holding that while "pure omissions" (complete silence absent any affirmative statement) are not actionable under Rule 10b-5(b), "a duty to disclose arises when one speaks, for Rule 10b-5(b) requires disclosure of information necessary to make statements made not misleading." Count II is a half-truth claim. It survives Macquarie.

83. Cohen made an affirmative statement that is the primary basis for Count II. On August 16, 2022, contemporaneously with the Amendment No. 2 filing, Cohen signed and submitted a Form 144 certification (Exhibit D). The last page of the Form 144, bottom right corner, contains an "ATTENTION" block stating: "The person for whose account the securities to which this notice relates are to be sold hereby represents by signing this notice that he does not know any material adverse information in regard to the current and prospective operations of the Issuer of the securities to be sold which has not been publicly disclosed. If such person has adopted a written trading plan or given trading instructions to satisfy Rule 10b5-1 under the Exchange Act, by signing the form and indicating the date that the plan was adopted or the instruction given, that person makes such representation as of the plan adoption or instruction date." By signing this form, Cohen swore that "he does not know any material adverse information in regard to the current and prospective operations of the Issuer of the securities to be sold which has not been publicly disclosed." Unlike the Item 4 language -- which contained the

qualifying "except as set forth herein" clause -- the Form 144 certification contains no qualifying language whatsoever. It is a categorical, unqualified statement of fact. It was not silence. It was speech -- affirmative, specific, and unconditional. And because it was speech, Rule 10b-5(b) required that it not mislead. It did mislead. The D.D.C. court independently found the Form 144 certification was "itself misleading" (D.D.C. Opinion at 15) -- a judicial finding that confirms the half- truth theory underlying this Count. Cohen possessed, through his three Cooperation Agreement board designees, at minimum five categories of material nonpublic information about BBBY at the time he signed the Form 144 certification: (a) supplier and vendor payment defaults demonstrating BBBY's inability to maintain normal commercial operations; (b) ABL/FILO facility deterioration and impending default triggers that would later materialize in the January 2023 acceleration notices; (c) the nonviability of the buybuy BABY sale process, publicly confirmed only in February 2023; (d) pending store closure and workforce reduction decisions that would be announced after his exit; and (e) the documented information pipeline established by the March 6, 2022 Cooperation Agreement (Exhibit B), which the D.D.C. court found "acknowledged that Cohen would receive material, nonpublic information." D.D.C. Opinion at 16. Each of these categories is the type of "material adverse information" the Form 144 required him to disclose. He disclosed none of them. A categorical certification of "he does not know" any undisclosed material adverse information, signed by a person with board-level access through three designated directors and five months of active information pipeline operation, is a half-truth -- made actionable under Macquarie Infrastructure Corp. v. Moab Partners, L.P., 601 U.S. 257, 144 S. Ct. 907 (2024) by what it omitted from what it said.

84. The omitted facts were material. Under Basic Inc. v. Levinson, 485 U.S. 224, 231-32 (1988), a fact is material if there is a substantial likelihood that a reasonable investor would consider it important. No reasonable investor receiving Cohen's Form 144 certification that "he does not know any material adverse information" would expect the certifying shareholder to have possessed five categories of MNPI about the company's path to insolvency. The five MNPI categories identified in Paragraph 83 were precisely the "material adverse information" the certification purported to disclaim knowledge of. Additionally, the pre-arrangement itself -- the fact that Cohen had engaged JP Morgan Securities LLC to execute a complete liquidation before filing the Form 144 -- was material adverse information that the certification concealed. Cohen certified he did not know any material adverse information at the very moment he was executing a pre-arranged plan to liquidate his entire position based on such information. Cohen's duty to speak completely under Rule 10b-5(b) and the half-truth doctrine confirmed in Macquarie Infrastructure Corp. v. Moab Partners, L.P., 601 U.S. 257, 144 S. Ct. 907 (2024) -- the duty that attaches whenever a speaker elects to make an affirmative statement -- required disclosure of both the MNPI and the pre-arrangement. He disclosed neither. The Structural Implausibility Analysis in Paragraph 29(a), and Charts 1 and 2 (set forth in Paragraph 2) documenting the institutional compliance sequence and the sequential bookbuilding steps required under upstairs market practice, confirm the institutional weight of this omission: the pre-arrangement was not a casual market inquiry but a formally initiated, multi-step process which, on information and belief, under standard prime brokerage practice would have required issuer pre-clearance, MNPI supervisory review, credit and risk approval, regulatory filing coordination, and written mandate -- each step generating a documented compliance record confirming that Cohen possessed the very information the

FIRST AMENDED COMPLAINT

Form 144 certification denied knowing. The certification did not merely omit material facts; it affirmatively represented the opposite of the truth.

85. Defendants acted with scienter as established in Paragraphs 50-54. Cohen knew of the pre-arrangement and possessed the five categories of MNPI when he signed the Form 144 certification (Exhibit D). His certification that "he does not know any material adverse information" while possessing that information was deliberate or, at minimum, made with reckless disregard for its materiality and its effect on the certification's accuracy. The Structural Implausibility Analysis documents that each step of the standard prime broker compliance sequence generates a documented compliance record -- meaning the pre-arrangement created an institutional paper trail confirming Cohen's awareness of the engagement at the moment of certification -- a false certification highly inconsistent with any innocent explanation premised on inadvertence, giving rise to a strong inference of knowing or reckless concealment.

86. Because the misleading nature of Cohen's Form 144 certification (Exhibit D) arises primarily from what it omitted -- the pre-arrangement fact and the five categories of MNPI Cohen possessed -- reliance is presumed under Affiliated Ute Citizens of Utah v. United States, 406 U.S. 128, 153-54 (1972). The Affiliated Ute presumption applies where, as here, a claim rests primarily on a defendant's failure to disclose a material fact in connection with an affirmative statement. See In re Alphabet Inc. Sec. Litig., 1 F.4th 687 (9th Cir. 2021) (permitting Affiliated Ute where falsity flows from omitted qualifying facts). The trigger for the duty was Cohen's act of signing the Form 144 certification (Exhibit D); the violation was his failure to ensure that certification was not materially misleading by the omission of facts necessary to make it complete.

Although the Form 144 was filed on paper rather than electronically, its substance was incorporated by reference in the contemporaneous Schedule 13D/A #2 (Exhibit E, Acc. No. 0001193805-22-001199), which was filed on EDGAR and nationally disseminated to all market participants. In the alternative, reliance is also presumed under the fraud-on-the-market doctrine of Basic Inc. v. Levinson, 485 U.S. 224 (1988), because the Form 144 certification's substance entered the market through the EDGAR-filed 13D/A #2 and operated on BBBY's market price during the period Plaintiff transacted, as established in Paragraphs 18 and 55. The omitted pre-arrangement fact and the five MNPI categories remained undisclosed throughout Plaintiff's entire purchase period, and Plaintiff would not have purchased BBBY shares at the prices paid had those facts been disclosed.

87. The half-truth caused Plaintiff's losses through the three causal tracks described in Paragraphs 59-65. The artificially maintained appearance of Cohen's continued bullish investment posture -- created and sustained by the incomplete certification -- inflated BBBY's share price and maintained a fraud premium that persisted into and throughout Plaintiff's January 19 to April 19, 2023 purchase period, as the August 18, 2022 disclosure of Cohen's exit had revealed only that he sold -- not the pre-arranged nature of his exit nor the categories of MNPI he possessed at the time of his certification -- leaving the market operating on an incomplete information set that corrected only stepwise through a series of subsequent disclosures, including the January 5, 2023 going-concern warning, the January 26 ABL default disclosure (10-Q), the February 7-8 abandonment of the buybuy BABY sale, and ultimately the April 23, 2023 bankruptcy filing, each of which revealed a category of concealed information Cohen had possessed when he made the half-truth certification and caused the corresponding stepwise price declines that directly

FIRST AMENDED COMPLAINT

injured Plaintiff. The ten market events mapped in Paragraph 7 -- eight corrective DOWN events and two price-sustaining UP events -- confirm the persistence and magnitude of the fraud premium the omission sustained. Furthermore, the concealed information enabled BBBY to raise survival capital through equity offerings during Plaintiff's purchase period (BBBY Form 8-K filed March 8, 2023 (SEC EDGAR Acc. No. 0001193125-23-063828); BBBY Form 8-K filed March 30, 2023 (SEC EDGAR Acc. No. 0001193125-23-084725); BBBY Form S-1 filed April 11, 2023 (SEC EDGAR Acc. No. 0001193125-23-097982)) at prices inflated by the misrepresentation -- capital raised at fraud-inflated prices whose attraction at those prices delayed rather than prevented bankruptcy while allowing Defendants' concealment to continue throughout Plaintiff's entire purchase period.

88. Plaintiff seeks the fraud-related inflation component of his approximately $23,400 in total losses attributable to Defendants' conduct under this Count, plus pre- and post-judgment interest, and such other relief as the Court deems just and proper.

COUNT III: VIOLATION OF SECTION 10(b) OF THE EXCHANGE ACT

AND RULE 10b-5(a) AND (c) -- SCHEME LIABILITY (Against All Defendants)

89. Plaintiff incorporates by reference all preceding paragraphs, including the Structural Implausibility Analysis, which establishes that a $178 million prime brokerage block trade requires sequential compliance steps inconsistent with

overnight arrangement. That inconsistency supports a strong inference that the JP Morgan engagement preceded the 9:16 a.m. Amendment No. 2 filing.

90. Rule 10b-5(a) and (c) prohibit employing any device, scheme, or artifice to defraud, and engaging in any act, practice, or course of business operating as a fraud in connection with the purchase or sale of a security. Lorenzo v. SEC, 587 U.S. 71, 78-79 (2019); In re Alphabet Inc. Sec. Litig., 1 F.4th 687 (9th Cir. 2021).

91. The four acts of independent deceptive conduct described in Paragraphs 45-47A -- (1) private JP Morgan compliance misrepresentations, (2) MNPI-informed option exercise, (3) deliberate regulatory sequencing, and (4) denominator manipulation -- collectively constitute a scheme to defraud. Each act satisfies the independence test (Paragraph 44): each would constitute deceptive conduct even if the 13D/A #2 had accurately stated Cohen's plans and the Form 144 had accurately disclosed his MNPI status.

(a) Private JP Morgan compliance misrepresentations (Paragraph 45) are non-public bilateral communications in a private channel entirely distinct from any public filing or regulatory statement. The facts supporting this allegation are peculiarly within Defendants' knowledge and control; Plaintiff has pleaded on information and belief, with five independent bases supporting the inference, including the FINRA supervisory obligation, the JP Morgan dual-client conflict, the completed execution itself, the parallel false Form 144 certification, and Defendants' exclusive possession of the compliance records.

(b) MNPI-informed option exercise (Paragraph 46) is a trade execution act, not a statement. Its deceptive character arises from exploiting undisclosed inside

knowledge, independent of filing content.

(c) Deliberate regulatory sequencing (Paragraph 47) -- filing the Form 144 before execution, executing the sale before public disclosure, and disclosing only on the last permissible day -- is a structural choice about order and timing, distinct from the content of any individual filing. The deception inheres in engineering the chronological appearance of a spontaneous exit, not in what any document says.

(d) Denominator manipulation as deceptive market conduct (Paragraph 47A) is a transactional reporting act -- the deliberate selection of a stale share-count denominator to report 9.8% ownership when Cohen's actual beneficial ownership was approximately 11.8%, concealing his above-10% status and the Section 16(b) commitment signal that honest disclosure would have sent to sophisticated market participants who understood above-10% filings as signals of long-term investment intent. The deceptive character of this act arises from the reporting manipulation itself, independent of any statement about plans or intentions.

(e) THE FOUR ACTS AS FALSE NARRATIVE ARCHITECTURE: The four scheme acts described above are not merely independent deceptive acts. They are the structural components that constructed and maintained the false narrative embedded in the filing sequence described in Paragraph 58.

Scheme Act One (JP Morgan compliance misrepresentations) enabled the block trade execution while concealing the MNPI from the market's view. Scheme Act Two (MNPI-informed option exercise) exploited the informational asymmetry the narrative protected. Scheme Act Three (deliberate regulatory sequencing) engineered the chronological appearance the narrative required. Scheme Act

Four (denominator manipulation) concealed Cohen's actual above-10% ownership stake and suppressed the market commitment signal that accurate disclosure would have generated.

Together, these four acts constructed the institutional and regulatory architecture of a false narrative that maintained a fraud premium in BBBY's market price through the entirety of Plaintiff's purchase period. That fraud premium's persistence is confirmed by the ten market events -- eight corrective DOWN and two price-sustaining UP -- mapped in Paragraph 7.

92. Under WPP Luxembourg Gamma Three Sarl v. Spot Runner, Inc., 655 F.3d 1039, 1057 (9th Cir. 2011), scheme liability requires conduct "distinct from" the alleged misstatement. Each of the four acts above satisfies that test: each would constitute deceptive conduct even if the 13D/A #2 had accurately stated Cohen's plans. Count III does not repackage Count I or Count II -- it identifies four categories of non-statement conduct that are independently deceptive.

93. The scheme operated in connection with Cohen's $178 million sale and Plaintiff's $23,400 purchase. Defendants acted with scienter as established in Paragraphs 50-54. The scheme caused Plaintiff's losses through the three causal tracks described in Paragraphs 59-65. The scheme's narrative dimension -- how the four acts constructed and maintained the false impression that Cohen's plans remained as previously described -- is established in Paragraph 91(e) and Paragraph 58. The stepwise price impact is mapped in the Correction Map (Paragraph 7).

94. Plaintiff seeks the fraud-related inflation component of his approximately $23,400 in total losses, plus pre- and post-judgment interest.

COUNT IV: SECTION 20(a) -- CONTROL PERSON LIABILITY

(Against Ryan Cohen Individually, in the Alternative)

95. Plaintiff incorporates by reference all preceding paragraphs.

96. This Count is pleaded in the alternative only as to the identity of the primary violator pursuant to Federal Rule of Civil Procedure 8(d)(2). It is asserted on the premise that RC Ventures committed the primary violations alleged in Counts I-III and that Cohen exercised actual power and control over RC Ventures in connection therewith. Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a), imposes liability on "[e]very person who, directly or indirectly, controls any person liable" under the Act. Where RC Ventures is found to be the Janus primary maker of the false or misleading statements at issue, Cohen is liable as a control person because he exercised actual power and control over RC Ventures and culpably participated in its violations. No. 84 Employer-Teamster Joint Council Pension Trust Fund

v. America West Holding Corp., 320 F.3d 920, 945 (9th Cir. 2003).

97. Cohen is RC Ventures' sole member, sole manager, and sole officer. Cohen personally directed every act constituting RC Ventures' primary liability under Counts I, II, and III.

98. The following facts, taken together, give rise to a strong inference that Cohen did not act in good faith in connection with the statements and omissions

FIRST AMENDED COMPLAINT

alleged:

(a) Cohen personally signed and certified the Schedule 13D/A filings at issue, confirming their accuracy as of the date of filing, notwithstanding the facts alleged herein regarding the JP Morgan engagement;

(b) Cohen personally designed and directed the sequence of public disclosures, including the timing and content of the August 16 and August 18 filings, in a manner that, on the facts alleged, maximized the period of artificial price inflation coinciding with his sales;

(c) Cohen personally directed and coordinated the JP Morgan block-sale engagement, communications regarding which are alleged to be inconsistent with the reactive, post-spike timeline he and RC Ventures have advanced;

(d) Cohen personally executed a Form 144 certification on August 16, 2022 -- the same date as the Schedule 13D/A Amendment No. 2 -- attesting to the availability of the Rule 144 exemption at a time when, on information and belief, the institutional compliance process documented in Charts 1 and 2 was already underway; and

(e) Cohen was, on the facts alleged, the primary public voice regarding BBBY's strategic prospects and the role of the RC Ventures stake -- as evidenced by his August 12, 2022 tweet (Exhibit C) and the EDGAR filings he personally signed -- which formed the basis of Plaintiff's investment decisions.

These specific facts, taken together, support a strong inference that Cohen acted knowingly or with deliberate recklessness, and are inconsistent with the genuine

belief of a person acting in good faith.

## COUNT V: NEVADA INTENTIONAL MISREPRESENTATION

(Pleaded in the Alternative under FRCP 8(d)(2)) (Against Ryan Cohen Individually)

99. Plaintiff incorporates by reference all preceding paragraphs.

100. Nevada recognizes a cause of action for intentional misrepresentation where: (1) the defendant made a false representation of material fact; (2) the defendant knew the representation was false; (3) the defendant intended to induce reliance; (4) the plaintiff justifiably relied; and (5) the plaintiff suffered damage. Bulbman, Inc. v. Nevada Bell, 108 Nev. 105, 825 P.2d 588, 592 (1992).

101. THE DUTY: Count V does not rest on Cohen's pre-exit social media activity in August 2022. It rests on a false regulatory representation (the Item 4 Representation) that Cohen voluntarily executed, filed on EDGAR, never corrected, and actively defended through litigation conducted while Plaintiff was purchasing BBBY securities. The duty element is established on four independent and mutually reinforcing grounds:

(a) VOLUNTARY REGULATORY REPRESENTATION: Under Barmettler v. Reno Air, Inc., 114 Nev. 441, 956 P.2d 1382, 1386-87 (1998), a party who voluntarily speaks assumes a duty of truthfulness to all parties who foreseeably rely on that speech. The Item 4 disclosure in Cohen's August 16, 2022 Schedule

13D/A is a voluntary representation: while the SEC requires a filer to disclose plans or intentions regarding the issuer's securities, the specific content that remained operative in Item 4 -- Cohen's voluntary choice to state, in the original Schedule 13D (Exhibit A), that no Reporting Person had any present plan to dispose of BBBY securities, and his equally voluntary choice not to amend that statement in Amendment No. 2 (Exhibit E) under 17 C.F.R. Section 240.13d-2(a) -- was his own representational choice within that mandatory framework. The entire purpose of the Schedule 13D/A disclosure regime is to enable investors to make informed trading decisions in reliance on large beneficial owners' stated intentions. Cohen knew that investors -- including prospective purchasers of BBBY securities during the months following the filing -- would foreseeably consult that EDGAR filing and act in reliance on it.

The mandatory nature of the 13D/A filing obligation does not negate the Barmettler duty: Cohen was compelled to file, but was not compelled to characterize his plans as unchanged -- that choice was his own. A filer who voluntarily selects a false characterization within a mandatory filing framework assumes Barmettler duties over the content he voluntarily chose.

(b) IDENTIFIABLE CLASS OF RELYING INVESTORS: The foreseeable relying class is defined by the regulatory structure itself: investors and their advisors who consulted Cohen's Schedule 13D/A filings before making investment decisions in BBBY securities. This class is bounded and identifiable. Plaintiff falls squarely within this class: Plaintiff's investment decisions during the purchase period were made against the backdrop of Cohen's publicly available regulatory disclosures, of which the original Schedule 13D's (Exhibit A) unamended Item 4 Representation -- "No Reporting Person has any present plan or proposal which would relate to or result in any of the matters set forth in

subparagraphs (a)-(j) of Item 4 of Schedule 13D except as set forth herein" -- never amended in any subsequent filing, was the last operative statement of Cohen's declared intentions regarding disposition on EDGAR before Plaintiff's first purchase.

(c) THE FALSE FILING SEQUENCE NARRATIVE: The duty violation is not the Item 4 Representation standing alone. The filing sequence communicated a false narrative: Cohen filed Amendment No. 2 on August 16, 2022, leaving the operative Exhibit A Item 4 Representation unamended; his entire $178 million position was disposed of that day and the next. That chronology was designed to suggest a reactive exit consistent with legitimate decision-making. As established in the Structural Implausibility Analysis, the institutional compliance sequence was already underway when Cohen filed Amendment No. 2 -- meaning the exit was pre-planned. The true story, which the filing sequence concealed, is categorically different: Cohen received adverse MNPI through board meetings attended by his three designated directors under the Cooperation Agreement, pre-arranged the block trade, and executed the pre-arranged liquidation the same morning he certified the opposite.

(d) WHAT WAS NEVER DISCLOSED: The subsequent amendment disclosing Cohen's exit revealed the outcome but not the reason. The market learned that Cohen sold. It did not learn that Cohen received adverse MNPI through board meetings attended by his three designated directors under the Cooperation Agreement indicating BBBY's imminent failure; that he pre-arranged an institutional block trade before filing the "no change" certification; or that the exit was planned rather than reactive. The reason for Cohen's exit -- the pre-arranged institutional liquidation executed while he left the Item 4 contingency representation operative and unamended -- has never been publicly

disclosed, regardless of what motivated Cohen to conceal that material change. Under Nevada Power Co. v. Monsanto Co., 891 F. Supp. 1406, 1415 (D. Nev. 1995), Cohen's duty to correct crystallized no later than August 17, 2022, the date by which the block trade was complete and the falsity was a documented fact within his personal knowledge. No correction has ever been made.

102. THE FALSE REPRESENTATION: On August 16, 2022, at 9:16 a.m. EST, Cohen filed Amendment No. 2 (Exhibit E) on EDGAR amending only Item 5 and containing no Item 4 -- thereby failing to disclose, as required by 17 C.F.R. § 240.13d-2(a), the material change in his plans, and leaving the Item 4 Representation operative on EDGAR. That representation had become materially misleading because Cohen's plans had crystallized from generic contingencies into a specific pre-arranged block trade -- the material change Amendment No. 2 failed to disclose.

As documented in the Structural Implausibility Analysis, the standard institutional compliance sequence for a $178 million block trade would, under standard institutional practice, have been underway before 9:16 a.m. on August 16. This supports a strong inference that the arrangement predated the Amendment No. 2 filing.

The Item 4 Representation was therefore a false representation of material fact at the precise moment of filing -- one that was never corrected, retracted, or explained through Plaintiff's purchase period or thereafter.

103. KNOWLEDGE OF FALSITY AND INTENT TO INDUCE RELIANCE: The institutional compliance sequence documented in Charts 1 and 2 is consistent with requiring the beneficial owner's personal participation at each

FIRST AMENDED COMPLAINT

initiating stage: on information and belief, issuer pre-clearance is obtained at the beneficial owner's direction; the Schedule 13D/A amendment is executed by Cohen personally; and the prime broker mandate requires the beneficial owner's written authorization. Each of these acts -- which the Structural Implausibility Analysis establishes would ordinarily precede the 9:16 a.m. filing -- was taken by Cohen personally. His direct participation in initiating the institutional sequence supports a strong inference that Cohen was aware of the pre-arrangement at the moment of filing -- an inference that is highly inconsistent with, and substantially more compelling than, any innocent explanation premised on inadvertence or ignorance of the engagement's status. Cohen's intent that investors rely on the Item 4 filing is established by the regulatory purpose of the disclosure itself: Schedule 13D/A Item 4 representations are filed on EDGAR precisely because investors and their advisors consult them to assess a large beneficial owner's plans and intentions before making investment decisions. Cohen knew this -- and left a materially incomplete Item 4 representation operative on EDGAR anyway.

104. (The pre-arrangement fact is the central undisclosed fact that Defendants never disclosed and that Plaintiff could not have discovered through reasonable diligence during the purchase period: the $178 million liquidation was arranged with JP Morgan Securities LLC before Cohen filed the Item 4 Representation -- "No Reporting Person has any present plan or proposal which would relate to or result in any of the matters set forth in subparagraphs (a)-(j) of Item 4 of Schedule 13D except as set forth herein" -- stating that no plans had changed.) PLAINTIFF'S DIRECT RELIANCE AND FRAUD PREMIUM THEORY: Plaintiff actually and justifiably relied on Cohen's false and misleading public filing sequence. Prior to each purchase during the January 19 -- April 19,

2023 purchase period, Plaintiff researched BBBY's publicly available SEC filings and was aware that no major shareholder had disclosed a present plan or arrangement to dispose of BBBY shares. Plaintiff purchased BBBY shares on the understanding that the operative Exhibit A Item 4 Representation remained accurate -- that no specific plan to liquidate had crystallized -- and that Cohen's August 2022 exit had not been pre-arranged on the basis of concealed material nonpublic information. Had the true facts been publicly disclosed -- that Cohen had pre-arranged a $178 million block trade with JP Morgan Securities LLC before filing Amendment No. 2, while possessing material nonpublic information indicating BBBY's path to insolvency -- Plaintiff would not have purchased BBBY securities at any price reflecting that false narrative. Plaintiff's Amended Declaration (Exhibit I) establishes these facts as to each purchase date. Additionally and corroboratively, Plaintiff's reliance is evidenced at the market level: the false filing sequence inflated BBBY's trading price by embedding a misrepresentation about the nature and circumstances of Cohen's exit -- a narrative that made the stock appear materially more viable than the truth would have permitted. An investor purchasing BBBY securities in January-April 2023 was relying, through market price, on the filing sequence having been accurate when made: that no MNPI was concealed behind the certification, that the exit was not pre-planned, and that the circumstances of Cohen's departure were consistent with a reactive investment decision rather than a pre-arranged liquidation on concealed catastrophic information. That sequence told a misrepresentation: a sophisticated activist investor left his Item 4 Representation operative and unamended -- without disclosing the material change to a specific pre-arranged block trade -- then sold everything -- an unexplained about-face consistent with deteriorating fundamentals but not corporate collapse. An investor reading that story sees uncertainty, not certainty of failure. As the alleged facts establish, the story Cohen's conduct tells is categorically different:

Cohen received adverse MNPI through board meetings attended by his three designated directors under the Cooperation Agreement indicating that BBBY faced a high probability of insolvency based on specific operational and financial conditions; pre-arranged a $178 million institutional block trade before Amendment No. 2 was filed; and executed the pre-arranged sale the same morning he left operative the original Schedule 13D's (Exhibit A) Item 4 Representation without amending Item 4 to disclose the material change in his plans, while filing Amendment No. 2 (Exhibit E) without any Item 4 amendment. An investor who understood that sequence would not have purchased BBBY at any price reflecting the Item 4 Representation, left operative by the August 16 filing sequence -- because the true story is not uncertain viability; it is planned exit on the basis of material nonpublic information indicating a materially heightened risk of insolvency -- acute liquidity deterioration, ABL facility stress, and operational collapse -- that a reasonable investor would consider highly material to any decision to purchase BBBY securities at prices premised on residual viability. The fraud premium -- the spread between those two narratives embedded in BBBY's trading price -- is confirmed by the stepwise correction map in Paragraph 7 (incorporated herein): ten market-relevant events on or after January 5, 2023 through April 11, 2023 (excluding the January 19, 2023 anchor row as explained in Paragraph 7), comprising eight corrective DOWN events and two price-sustaining UP events, confirm that the market was continuously receiving previously undisclosed information throughout Plaintiff's purchase period. Plaintiff purchased at prices inflated by the false narrative and suffered the resulting losses as the concealed information continued to be revealed. The falsity was not apparent from the public record until the D.D.C. issued its opinion on July 27, 2023. Plaintiff's Amended Declaration (Exhibit I) establishes the causal role of this inflated narrative in his purchasing decisions.

105. MISLEADING STATEMENT REMAINED OPERATIVE AND UNCORRECTED DURING THE PURCHASE PERIOD: The false and misleading Item 4 filing sequence remained uncorrected on EDGAR throughout Plaintiff's purchase period. Cohen filed no curative Schedule 13D/A amendment, never publicly retracted or qualified the Item 4 Representation, and never disclosed to the market the fact of the pre-arranged JP Morgan block trade. The absence of any corrective filing through the end of Plaintiff's purchase period on April 19, 2023 confirms that the duty of truthfulness arising from Cohen's voluntary EDGAR filing -- as established in Paragraph 101(a) under Barmettler v. Reno Air, Inc., 114 Nev. 441, 956 P.2d 1382, 1386-87 (1998) -- remained operative and uncorrected during the period in which Plaintiff made his purchases. This allegation does not assert a free-standing continuing obligation to monitor or update the market; it rests on the narrower principle, recognized in Barmettler, that a statement voluntarily made and uncorrected may give rise to liability where it remained in the market and was reasonably relied upon during the relevant period. Because the Item 4 Representation, left operative by the August 16 filing sequence, remained uncorrected, the fraud premium it established in BBBY's market price persisted through each of Plaintiff's purchases.

106. SLUSA DOES NOT PREEMPT THESE CLAIMS: SLUSA applies only to "covered class actions" involving more than 50 persons. 15 U.S.C. Section 78bb(f)(5)(B). This is an individual action brought by a single named plaintiff on his own behalf -- not a class action, not a group action, and not brought on behalf of more than 50 persons. SLUSA is therefore inapplicable by its plain terms. The Prayer for Relief seeks damages solely for Plaintiff's individual losses. The Nevada claims are grounded in state tort duties arising from

FIRST AMENDED COMPLAINT

Cohen's voluntary EDGAR filing and Barmettler voluntary-speech duty, Barmettler v. Reno Air, Inc., 114 Nev. 441, 956 P.2d 1382, 1386-87 (1998), independent of the federal securities laws. These state-law claims provide alternative relief theories that supplement, rather than duplicate, the federal counts.

107. DAMAGES: Plaintiff seeks the fraud-related inflation component of his approximately $23,400 in total losses, plus punitive damages under NRS 42.005.

## COUNT VI: NEVADA FRAUDULENT CONCEALMENT

(Pleaded in the Alternative under FRCP 8(d)(2)) (Against All Defendants)

108. Plaintiff incorporates by reference all preceding paragraphs. Count VI encompasses the full course of Cohen's misrepresentations and omissions, including the Item 4 Representation, the August 2022 filing sequence, and the other false and misleading statements and omissions specifically identified and pleaded in this complaint.

109. Nevada recognizes a cause of action for fraudulent concealment where a defendant has a duty to disclose a material fact and deliberately suppresses it. Nelson v. Heer, 123 Nev. 217, 163 P.3d 420, 426 (2007).

110. THE DUTY TO DISCLOSE: For the reasons established in Paragraph 101, which is incorporated herein by reference, Cohen had a duty to disclose material facts arising from his voluntary EDGAR filing, which remained

operative and uncorrected during Plaintiff's entire purchase period.

111. THE DUTY TO CORRECT: Having made the August 12 post (Exhibit C) and the August 16 regulatory filings presenting a materially false picture to his retail investor audience, Cohen had a duty to correct those communications. Under Nevada law, a party who has made a representation has a duty to correct it when he subsequently acquires information indicating the representation was false. Nevada Power Co.

v. Monsanto Co., 891 F. Supp. 1406, 1415 (D. Nev. 1995). Cohen's duty to correct arose under Nevada Power Co. v. Monsanto Co. and the voluntary-content/voluntary-non-amendment doctrine applicable to his public regulatory filings.

112. THE CONCEALMENT: The fraudulent concealment was consummated on August 16, 2022, at 9:16 a.m. EST, when Cohen filed Amendment No. 2 (Exhibit E) amending only Item 5 -- deliberately omitting any amendment to Item 4 -- thereby failing to disclose the material change in his plans required by 17 C.F.R. § 240.13d-2(a). The Item 4 Representation remained operative on EDGAR while the institutional compliance machinery for his $178 million block trade was already underway.

As established in the Structural Implausibility Analysis, what Cohen concealed was not a casual market inquiry but a formally initiated, multi-step institutional process -- each step generating a documented compliance record confirming the arrangement's existence at the moment Cohen signed the Form 144 certification (Exhibit D). Filing Amendment No. 2 without amending the Item 4 Representation was therefore not merely a failure to disclose; it was a deliberate

act of suppression.

The concealment continued actively during Plaintiff's purchase period. On January 30, 2023, the D.D.C. class action complaint publicly challenged Cohen's Form 144 certification -- making his duty to correct unambiguous. Through the entirety of Plaintiff's purchase period ending April 19, 2023, Cohen never filed a curative amendment, never publicly retracted the Item 4 Representation, and never disclosed the pre-arrangement.

The concealment's narrative dimension enabled the accelerated-bankruptcy harm: the Item 4 Representation, left operative by the August 16 filing sequence, allowed BBBY to raise survival capital through the three equity offerings identified in Paragraph 65(b) at fraud-inflated prices. The stepwise correction map in Paragraph 7 quantifies the price premium this concealment sustained -- eight corrective DOWN events each revealing a category of concealed information, and two UP events confirming the fraud premium's persistence during temporary relief periods.

113. PLAINTIFF'S RELIANCE: Plaintiff actually and justifiably relied on the absence of any public disclosure of the pre-arrangement concealed by the filing sequence. Prior to each of his BBBY purchases during the January 19 -- April 19, 2023 purchase period, Plaintiff researched BBBY's SEC filings and public record and was aware that no insider had publicly disclosed a present plan or pre-arrangement to liquidate a large BBBY position. Plaintiff made each purchase in reliance on the public record showing no such disclosure had been made. Had the pre-arrangement, Cohen's MNPI possession, or the falsity of the Item 4 Representation been publicly disclosed, Plaintiff would not have purchased BBBY securities at any of the prices he paid. Plaintiff's

Amended Declaration (Exhibit I) establishes these facts as to each purchase date.

114. COMPARATIVE FAULT IS INAPPLICABLE: NRS 41.141 does not apply to this action. Nevada's comparative fault statute expressly applies to actions based on "negligence or strict liability" -- not to intentional torts. See NRS 41.141(1). Both Count V (intentional misrepresentation) and Count VI (fraudulent concealment) are intentional torts under Nevada law. A defendant who commits intentional fraud cannot invoke comparative fault principles designed for negligence actions to reduce the plaintiff's recovery. Plaintiff's decision to purchase a distressed security is therefore not a mitigating factor under NRS 41.141, and no comparative fault reduction applies to Counts V or VI.

115. DAMAGES: Plaintiff suffered the fraud-related inflation component of his approximately $23,400 in total losses. Cohen's conduct warrants punitive damages under NRS 42.005.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Anthony Mitchell respectfully prays that this Court enter judgment:

## COUNTS I AND II:

(a) Awarding Plaintiff compensatory damages against all Defendants, jointly and severally, for the fraud-related inflation component of his approximately $23,400

in total losses, in an amount to be quantified at trial through event study methodology, plus pre- and post-judgment interest.

## COUNT III:

(b) Awarding compensatory damages against all Defendants for the fraud-related inflation component of Plaintiff's approximately $23,400 in total losses caused by the scheme to defraud, in an amount to be established at trial, plus pre- and post-judgment interest.

## COUNT IV:

(c) Awarding compensatory damages against Ryan Cohen individually as a control person, in an amount to be established at trial.

## COUNTS V AND VI:

(d) Awarding Plaintiff the fraud-related inflation component of his approximately $23,400 in total losses under Nevada law, plus punitive damages under NRS 42.005.

ALL COUNTS: (e) Awarding Plaintiff his costs of suit; and

(f) Granting such other and further relief as this Court deems just and proper.

FIRST AMENDED COMPLAINT

## DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury of all issues triable to a jury.

Respectfully submitted,

Dated: March 28, 2026

/s/ Anthony Mitchell Anthony Mitchell, Pro Se

North Las Vegas, Nevada 89084

Tel: (702) 884-0472 Email: realanthonymitchell@gmail.com

## VERIFICATION

Plaintiff Anthony Mitchell verifies under penalty of perjury that the factual allegations in this First Amended Complaint are true and correct to the best of his knowledge, information, and belief.

Dated: March 28, 2026

/s/ Anthony Mitchell Anthony Mitchell

Pro Se Plaintiff

## CERTIFICATE OF SERVICE

I hereby certify that on March 28, 2026, I served the foregoing First Amended Complaint on all appearing counsel of record by the following methods:

(1) By electronic mail (email) to counsel for Defendants; and

(2) By U.S. first-class mail, postage prepaid, to counsel for Defendants at the address of record.

I further certify that on the same date I transmitted the foregoing First Amended Complaint to the Clerk of Court by electronic mail (email) for filing.

Dated: March 28, 2026

/s/ Anthony Mitchell Anthony Mitchell, Pro Se

North Las Vegas, Nevada 89084

Tel: (702) 884-0472 Email: realanthonymitchell@gmail.com

EXHIBIT INDEX

Exhibit A -- Schedule 13D filed by RC Ventures LLC (March 7, 2022)

Exhibit B -- Cooperation Agreement between RC Ventures LLC and BBBY (March 6, 2022)

Exhibit C -- Cohen August 12, 2022 Twitter/X Post

Exhibit D -- Form 144 filed by RC Ventures LLC (August 16, 2022)

Exhibit E -- Schedule 13D/A #2 filed by RC Ventures LLC (August 16, 2022)

Exhibit F -- Schedule 13D/A #3 filed by RC Ventures LLC (August 18, 2022)

Exhibit G -- BBBY Public Disclosures and Stock-Price Chronology (August 2022 - April 2023)

FIRST AMENDED COMPLAINT

Exhibit H -- D.D.C. Memorandum Opinion -- In re Bed Bath & Beyond Corp. Sec. Litig. (Jul. 27, 2023)

Exhibit I -- Plaintiff's Amended Declaration

Exhibit J -- Plaintiff's Robinhood Brokerage Records -- BBBY Transactions, January 19, 2023 through April 19, 2023